**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Matthew C. MACIAGA, Defendant–Appellant.**

**No. 91–3075.**

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1992.

Decided June 8, 1992.

Sean B. Martin, Asst. U.S. Atty., Criminal Div., Chicago, Ill., Scott A. Verseman (argued), Office of U.S. Atty., Rockford, Ill., for plaintiff-appellee.

Stephen J. Knorr, Carol A. Brook, Deane Beth Brown (argued), Office of Federal

---

Public Defender, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Matthew Maciaga pleaded guilty to two counts of bank larceny in violation of 18 U.S.C. § 2113(b). Maciaga was sentenced under the Sentencing Guidelines to a split-sentence of four months imprisonment and four months work release, to be followed by a three-year term of supervised release. In calculating the sentence, the district court imposed a two-level enhancement for "more than minimal planning" pursuant to U.S.S.G. § 2B1.1(b)(5). Maciaga contests this enhancement on appeal. Because we believe the evidence is insufficient to support a finding of "more than minimal planning," we reverse.

## I. Background

Maciaga was employed by Alsip Bank and Trust as a part-time security guard. Typically, he arrived for the morning shift at approximately 5:30 a.m., and was responsible for opening the bank. He would enter his personal security code in a computer which deactivated the central alarm and recorded his presence in the bank. He was responsible for guarding the bank until other bank employees arrived. Pursuant to bank procedures, in the presence of at least two other employees, he would then open the night deposit safe. As a security guard, he had access to the keys and combination of this safe.

On May 30, 1989, Maciaga arrived for work as usual. After deactivating the alarm and without waiting for anyone else to arrive, he opened the night deposit safe, removed a deposit bag, placed it in the trunk of his car, and returned to the bank where he finished his shift. After work, he took $5,350 in cash from the deposit bag,

and destroyed both the bag and the customer's deposit ticket. The bank's customer, Swap–O–Rama, soon discovered the deposit had not been credited to its account, and contacted the bank. Not surprisingly, the bank could not find the missing deposit. Maciaga contacted Sergeant Roy Deters of the Alsip Police Department, the person who had made the missing deposit, and told him that he was a security guard at the bank and that he had heard about the missing deposit.[1] He told Deters that he had been having problems removing deposit bags from the night depository. He further stated that two deposit bags had recently gotten stuck in the chute of the depository and that one of these bags tore while he was removing it. Maciaga confirmed to the investigating officer of the Alsip Police Department that he had in fact had problems with deposits becoming stuck in the chute. Upon the bank's request, the company which had made the safe inspected it and reported that it was functioning properly. The case was closed, the bank dropped its investigation, concluding that Swap–O–Rama had made the error.

On August 14, 1989, Maciaga reported to work and accidentally set-off one of the alarms. The two police officers responding to the alarm were met by Maciaga who informed them that he had been having trouble deactivating the alarm system. Based on his assurances that nothing was wrong, the officers left. Seizing the opportunity, Maciaga then removed two bags containing approximately $12,000 from the night deposit safe, and placed them in the trunk of his car. He returned to the bank and completed his shift as usual.

The bank began an investigation into the missing deposits. On September 1, 1989, Maciaga failed the bank's polygraph examination. On February 1, 1990, Maciaga failed a polygraph examination administered by the Federal Bureau of Investigation. Immediately thereafter, he confess-

---

1. Maciaga maintains that he did not affirmatively seek out Deters, but that he only returned a phone call from Deters. Deters stated in an interview with the Federal Bureau of Investigation that Maciaga first left a message with the Alsip Police Department for Deters to contact him. Deters returned the call, but got the bank's recording. Maciaga called him back the following day. The district court made no explicit finding on the issue of who initiated the phone calls.

ed. On February 28, 1991, he pleaded guilty to two counts of bank larceny.

At sentencing, the government requested an enhancement of Maciaga's base offense level for "more than minimal planning." U.S.S.G. § 2B1.1(b)(5). The defendant argued that this enhancement was not warranted. The presentence report prepared by the Probation Office recommended against enhancing for "more than minimal planning," stating the facts were inconclusive. The sentencing judge imposed the enhancement. She found that the second theft was opportune, but that the first theft was planned. (Sent. Tr. at 12). She explained:

> To me providing the false information about which I've mentioned, the bags being stuck or torn in the chute, and the statements that he made to the police officers to throw them off the track, . . . to me these were affirmative steps to hide the crime. And so for that reason I find that it should be more than minimal planning.

*Id.* at 13.

## II. Analysis

■ We will affirm a district court's enhancement for "more than minimal planning" unless the district court's finding is clearly erroneous. *United States v. Lennick,* 917 F.2d 974, 979 (7th Cir.1990). The district court's determination will be treated with deference, and will be reversed only if this Court is left "with a definite and firm conviction that a mistake has been committed." *United States v. White,* 903 F.2d 457, 466 (7th Cir.1990) (quoting *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989)).

■ The Sentencing Guidelines describe "more than minimal planning" as follows:

> "More than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense. . . .
> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is

clear that each instance was purely opportune. Consequently, this adjustment will apply especially frequently in property offenses.

> In an assault, for example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location, or wearing a ski mask to prevent identification, would constitute more than minimal planning.

> In a commercial burglary, for example, checking the area to make sure no witnesses were present would not alone constitute more than minimal planning. By contrast, obtaining building plans to plot a particular course of entry, or disabling an alarm system, would constitute more than minimal planning.

> In a theft, going to a secluded area of a store to conceal the stolen item in one's pocket would not alone constitute more than minimal planning. However, repeated instances of such thefts on several occasions would constitute more than minimal planning. Similarly, fashioning a special device to conceal the property, or obtaining information on delivery dates so that an especially valuable item could be obtained, would constitute more than minimal planning.

> In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

U.S.S.G. § 1B1.1, *Application Note* 1(f). Because the Sentencing Guidelines identify three distinct categories that justify imposing the enhancement—more than typical planning, repeated acts and significant steps to conceal—we will address each briefly.

### A. More Planning than Typical

Maciaga's scheme was much less complicated and shows much less premeditation

than most cases in which the enhancement has been applied. *Lennick,* 917 F.2d at 979 ("It is true that the courts have generally applied the 'more than minimal planning' enhancement provision to factual scenarios involving clear examples of repeated or complex criminal activity."). *See, e.g., United States v. Deeb,* 944 F.2d 545 (9th Cir.1991), *cert. denied,* 112 S.Ct. 1597 60 U.S.L.W. 3688 (1992) (complicated embezzlement involving three coconspirators and two separate bank accounts); *United States v. Johnson,* 911 F.2d 403 (10th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1004, 112 L.Ed.2d 1087 (1991) (theft after purchasing bolt cutters to cut lock, obtaining notice of where targeted equipment was to be stored, and disabling alarm system).

The government cites numerous facts in support of the argument that this case does not represent "simple" bank larceny, but none of these defeats the contention that Maciaga committed simple crimes. The government relies heavily on the fact that Maciaga deactivated the alarm system before taking the deposits. Perhaps if Maciaga had taken the security guard job with the intent of learning to deactivate the alarm in order to steal money, he would have engaged in more than typical planning. But there is no evidence of such foresight, and deactivating the alarm was part of his ordinary duties; no additional planning was required. The government compares this case to *United States v. Jenkins,* 901 F.2d 1075 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990), a factually similar case in which a bank security guard stole deposits from the after-hours depository. Yet in *Jenkins,* there was more evidence of preplanning. Jenkins could not deactivate the alarm, so he had to move quickly to remove and hide the deposits and be ready with a plausible story in the one to two minutes it took the police to respond to the alarm. To accomplish all this in such a short period, the *Jenkins* court found that he must have done some preplanning. *Id.* at 1084. The government also relies on the facts that Maciaga hid the deposits in the trunk of his car, destroyed the bags and deposit slips, and spread the story about a malfunctioning depository. However, these facts go towards the issue of concealment and will be addressed below. They do not demonstrate that Maciaga had to take any unusual steps or that he engaged in any atypical planning to get the money.

## B. Repeated Acts

Maciaga did not commit "repeated acts over a period of time." We have discovered no cases where "more than minimal planning" was applied to fewer than three repeated acts. In addition, when repeated acts were found, the acts were interrelated. *See, e.g., United States v. Cianscewski,* 894 F.2d 74 (3d Cir.1990) (defendant sold three stolen checks on three prearranged occasions over a three-week period at the same location). Here, the sentencing judge found that the second theft was opportune, thus distinguishing this case from those in which "repeated acts" were established. Although it is true that the Sentencing Guidelines state that the court must find that *each instance* was purely opportune, the examples listed involve *several* acts. It is a reasonable assumption that two acts— one opportune and one planned—are not the sort of repeated acts the drafters sought to address. Moreover, the district judge did not base her decision on the existence of repeated acts, but on "significant affirmative steps" to conceal the crime.

## C. Steps to Conceal

Maciaga hid the deposit bags in his trunk and later destroyed the bags and deposit slips. After the first theft, he told police that the night depository was malfunctioning. Hiding the money and destroying evidence of the theft does not amount to "more than minimal planning," since any thief might do the same. Nor do we believe that Maciaga did anything extraordinary in deflecting suspicion away from himself. When the enhancement has been applied because a defendant has taken significant steps to conceal the offense, evidence of some pre-offense planning *of the concealment* has been present. For exam-

ple, in the Sentencing Guidelines illustrations, "more than minimal planning" is applicable when a defendant wears a ski mask to conceal his identity during commission of the offense, or upon the creation of false purchase orders and invoices. In *United States v. Lennick*, 917 F.2d 974, the defendant was convicted of making a false statement to a federal agent after he told the agent that it was he, and not his friend (a convicted felon), who owned the firearm with which his friend was charged with possession. To conceal his lie, Lennick, in advance, fraudulently acquired a receipt for the gun and hired an attorney to write to the police department and publicly demand the return of the gun. Unlike these scenarios, there is no evidence of any advance planning in Maciaga's efforts at concealment.

Even while finding that in misleading the police Maciaga engaged in "more than minimal planning," the sentencing judge herself acknowledged, "[i]t would be logical that a person would not admit it and would not want to encourage an investigation." (Sent. Tr. at 13). Maciaga did no more than take the "logical" step of discouraging an investigation. Maciaga's story explaining his theft is analogous to the embezzler who hides his one taking with a single false book entry. Like the embezzler, Maciaga took a simple step to hide his crime; it does not amount to "more than minimal planning."

The judgment of the district court is REVERSED and REMANDED for resentencing in accordance with this opinion.