February 24, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-1944

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 MICHAEL W. BEAUCHAMP,

 Defendant, Appellant.

 

 ERRATA SHEET

 The opinion of this Court issued on February 16, 1993, is
amended as follows:

 On page 16, last line of footnote 4, replace "mislead" with
"misled".

February 16, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-1944

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 MICHAEL W. BEAUCHAMP,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ernest C. Torres, U.S. District Judge]
 
 

 Before

 Breyer, Chief Judge,
 

 Campbell and Bownes, Senior Circuit Judges. 
 

 

David L. Martin, by Appointment of the Court, for appellant.
 
Lawrence D. Gaynor, Assistant United States Attorney, with whom
 
Lincoln C. Almond, United States Attorney, was on brief for the United
 
States.

 

 February 16, 1993
 

 CAMPBELL, Senior Circuit Judge.
 

Defendant/appellant, Michael W. Beauchamp, appeals from his

conviction in the United States District Court for the

District of Rhode Island for uttering and publishing a forged

United States Treasury check and for aiding and abetting

others in uttering and publishing the check in violation of

18 U.S.C. 510(a)(2) and 2. Defendant raises two arguments

on appeal: (1) the district court abused its discretion by

refusing to allow defendant to present testimony impeaching

the credibility of a witness; and (2) the district court

clearly erred in concluding that the offense involved more

than minimal planning under U.S.S.G. 2F1.1(b)(2)(A).

Finding no error, we affirm.

 I.

 On December 4, 1991, defendant was indicted and

charged with uttering and publishing a forged treasury check

and aiding and abetting others in uttering and publishing the

check in violation of 18 U.S.C. 510(a)(2) and 2. After

defendant's first trial ended in a mistrial, the case

proceeded to trial again on May 18, 1992. 

 The evidence indicated that on May 4, 1990, the

Internal Revenue Service mailed a tax refund check in the

amount of $2006.20 to Francisca and Domingo Franco of Central

Falls, Rhode Island. The Francos never received their check.

Instead, on May 17, 1990, defendant deposited the Francos'

 -3-

refund check in a checking account he had opened two days

earlier at a Fleet Bank branch in Lincoln, Rhode Island. The

back of the refund check was endorsed "Domingo Franco" and

"Francisco (sic) D. Franco." Underneath the endorsements,

which were forged, defendant signed his own name and address.

No other deposits were made to the account, which reached a

zero balance on June 5, 1990. The account was closed on

July 16, 1990.

 In May of 1991, the Providence office of the United

States Secret Service began an investigation into possible

fraud in the negotiation of the Francos' refund check. As

defendant's name and address were on the back of the check,

Special Agent Rudolph Rivera contacted him. Defendant

admitted to having signed his name on the back of the check,

but stated that he had been handed the check by a Hispanic

man as partial payment for a car. According to defendant, an

acquaintance of his, named Joseph Massey, had brought the

Hispanic man to defendant to buy the car. Defendant claimed

that the Hispanic man had identified himself as the payee on

the refund check.

 Special Agent Rivera obtained from the defendant

exemplars of the defendant's handwriting. After examining

these, Rivera concluded that defendant's handwriting was

dissimilar from the forged signatures.

 -4-

 In late July, 1991, Fleet Bank contacted Detective

William Carnes of the Lincoln, Rhode Island, Police

Department concerning the Francos' refund check. After an

interview with defendant in which defendant repeated his

story with minor variations, defendant, Detective Carnes, and

another police officer traveled to Central Falls in search of

the Hispanic man to whom defendant had allegedly sold the

car, as well as to Union Avenue in Providence to search for

an "Italian guy" who allegedly had sold the car to defendant.

Their search was unsuccessful. Detective Carnes located

Joseph Massey and obtained Massey's agreement to speak to

Special Agent Rivera about the case. In a written statement,

Massey corroborated defendant's story about the Hispanic man.

 After federal investigators recontacted Massey in

February 1992, Massey admitted that his prior written

statement was false. Massey testified for the government at

trial. He admitted on direct examination that he had been

convicted once for forging a welfare check and twice for

larceny of a motor vehicle. Massey testified that on August

1, 1991, defendant went to Massey's wife's house and told

Massey that he was in trouble about a check. During this

conversation, defendant asked Massey to tell the police the

story about the Hispanic man. Massey agreed because he

believed defendant was threatening him.

 -5-

 Defendant was denied permission to call as a

witness Zelmare Amaral, the landlady of 101 Carpenter Street,

Pawtucket, Rhode Island. Defendant sought to introduce Mrs.

Amaral's testimony primarily to impeach Massey's testimony

that he lived at the 101 Carpenter Street address. Mrs.

Amaral had testified at the first trial that Massey's brother

and sister, not Massey, resided at 101 Carpenter Street,

although she acknowledged having seen Massey there. The

court would not allow Mrs. Amaral to testify, saying

defendant was merely seeking to impeach Massey on a "very

collateral" matter.

 The jury returned a guilty verdict and defendant

was sentenced to 11 months imprisonment. This appeal

followed.

 II.

 A. Impeachment on Collateral Matters
 

 Defendant contends the district court abused its

discretion when it precluded Mrs. Amaral from taking the

stand to contradict Massey's testimony that he lived at 101

Carpenter Street. Defendant points to Supreme Court

authority that a defendant is entitled to cross-examine a

witness as to his or her name and address. See Smith v.
 

Illinois, 390 U.S. 129, 131 (1968); Alford v. United States,
 

282 U.S. 687, 693 (1931). Defendant concedes, as he must,

that the district court permitted him to cross-examine Massey

 -6-

on his address. Defendant contends, however, that the value

of his right to ask Massey where he lives for the purpose of

"exposing falsehood" is vastly diminished if defendant cannot

also present extrinsic evidence demonstrating that Massey has

lied. Defendant additionally argues that, quite apart from

the value of Mrs. Amaral's testimony to impeach Massey by

contradiction, the proffered testimony was relevant to expose

Massey's motive to testify falsely. We find neither argument

persuasive.

 It is well established that a party may not present

extrinsic evidence to impeach a witness by contradiction on a

collateral matter.1 E.g., United States v. Pisari, 636 F.2d
 

 

1. The government argues that Mrs. Amaral's testimony is
barred by Rule 608(b) of the Federal Rules of Evidence, which
expressly precludes the use of extrinsic evidence solely to
impeach a witness's credibility. The rule states in relevant
part: "Specific instances of the conduct of a witness, for
the purpose of attacking or supporting the witness'
credibility, other than conviction of crime as provided in
rule 609, may not be proved by extrinsic evidence." Like the
general rule barring the use of extrinsic evidence to impeach
a witness on a collateral matter through contradiction, the
purpose of Rule 608(b)'s prohibition of extrinsic evidence is
to avoid holding mini-trials on irrelevant or collateral
matters. E.g., United States v. Ciampaglia, 628 F.2d 632,
 
641-42 (1st Cir.), cert. denied, 449 U.S. 956 (1980); United
 
States v. Martz, 964 F.2d 787, 789 (8th Cir.), cert. denied,
 
61 U.S.L.W. 3435 (1992). In the present context, however, it
is difficult to conceptualize the actual location of Massey's
residence as being a "specific instance of conduct" within
the meaning of Rule 608(b). See United States v. Tarantino,
 
846 F.2d 1384, 1409 (D.C. Cir.) (Rule 608(b) addresses
conduct indicative of untruthfulness, such as fraudulent and
dishonest behavior), cert. denied, 488 U.S. 867 (1988);
 
United States v. Opager, 589 F.2d 799, 801 (5th Cir. 1979)
 
(same). Like the district court, we think guidance is to be
found in the more general rule as to collateral matters.

 -7-

855, 859 (1st Cir. 1981); 1 McCormack on Evidence 45, at
 

169 (4th ed. 1992). Thus, it is often said that when a

witness testifies to a collateral matter, the examiner "must

take [the] answer," i.e., the examiner may not disprove it by

extrinsic evidence. E.g., United States v. Martz, 964 F.2d
 

787, 789 (8th Cir.), cert. denied, 61 U.S.L.W. 3435 (1992);
 

United States v. Young, 952 F.2d 1252, 1259 (10th Cir. 1991);
 

1 McCormack on Evidence 45, at 170. A matter is considered
 

collateral if "the matter itself is not relevant in the

litigation to establish a fact of consequence, i.e., not

relevant for a purpose other than mere contradiction of the

in-court testimony of the witness." 1 McCormack on Evidence
 

 45, at 169. Stated another way, extrinsic evidence to

disprove a fact testified to by a witness is admissible when

it satisfies the Rule 403 balancing test and is not barred by

any other rule of evidence. See United States v. Tarantino,
 

846 F.2d 1384, 1409 (D.C. Cir.) ("The 'specific

contradiction' rule . . . is a particular instance of the

trial court's general power under Fed. R. Evid. 403 to

exclude evidence 'if its probative value is substantially

outweighed . . . by considerations of undue delay, [or] waste

of time.'"), cert. denied, 488 U.S. 867 (1988); Pisari, 636
 

F.2d at 858; 3 Weinstein's Evidence, 607[5], at 607-79, -80
 

(1992). To the extent Mrs. Amaral's testimony merely went to

 -8-

Massey's credibility by demonstrating a contradiction on an

immaterial matter, it was clearly excludible.

 Defendant contends that testimony as to Massey's

residence was not merely collateral, but was relevant and

admissible for a purpose other than impeaching Massey's

general character for truthfulness or untruthfulness through

contradiction. According to defendant, Massey's insistence

that he lived at 101 Carpenter Street in Pawtucket and not at

his wife's house on Pine Street in Central Falls, could have

been viewed as an attempt to distance himself from the forged

check, which had originally been mailed to the Francos'

residence in Central Falls. According to defendant, Massey's

alleged falsehood concerning his residence would thus expose

a motive to shift culpability for stealing the check from

himself to defendant. 

 But while a witness's self-interest or motive to

testify falsely is generally considered to be a non-

collateral issue, United States v. Rios Ruiz, 579 F.2d 670,
 

673 (1st Cir. 1978) (bias); United States v. Calle, 822 F.2d
 

1016, 1021 (11th Cir. 1987) (self-interest in testifying), we

think the district court was entitled to conclude that the

"marginal relevance" of Mrs. Amaral's proposed testimony was

outweighed by the "time and effort" it would entail to

present this testimony. As noted by the district judge, who

presided over defendant's first trial, Mrs. Amaral's

 -9-

testimony was inconclusive. She testified that she

occasionally saw Massey, a truck driver, at 101 Carpenter

Street, but that his brother and sister paid the rent.

Moreover, as the district court noted, Pawtucket is adjacent

to Central Falls; therefore, whether Massey lived at his

siblings' house in Pawtucket or his wife's house in Central

Falls said little about Massey's personal involvement in the

crime, particularly since there had already been testimony

that Massey spent at least some time at both locations.

Under the circumstances, we cannot say that the district

court abused its discretion in excluding Mrs. Amaral's

proposed testimony concerning whether Massey lived at 101

Carpenter Street.

 B. More Than Minimal Planning
 

 Defendant next argues that the district court

clearly erred when it increased defendant's offense level by

two levels, having determined that his offense involved more

than minimal planning under U.S.S.G. 2F1.1(b)(2)(A).

Section 2F1.1(b)(2)(A), which governs offenses involving

fraud or deceit, states that if an offense involves more than

minimal planning, the offense level should be increased by

two levels. Application Note 1(f) of the commentary to

U.S.S.G. 1B1.1 defines what constitutes more than minimal

planning. It states, in part, the following:

 "More than minimal planning" also exists
 if significant affirmative steps were

 -10-

 taken to conceal the offense, other than
 conduct to which 3C1.1 (Obstructing or
 Impeding the Administration of Justice)
 applies.

Relying on the above-quoted passage, the district court

enhanced defendant's offense level for more than minimal

planning on the basis of defendant's attempts to mislead

investigators with his false story which he got Massey to

corroborate about a Hispanic man. We review the district

court's enhancement for more than minimal planning only for

clear error. E.g., United States v. Gregorio, 956 F.2d 341,
 

343 (1st Cir. 1992).

 On appeal, both parties focus their arguments on

whether the "significant affirmative steps" to conceal

mentioned in 1B1.1, Application Note 1(f), must take place

before a defendant commits an offense for an enhancement
 

under 2F1.1(b)(2)(A) to apply. Defendant argues that in

order for the more than minimal planning enhancement to be

applied based on significant affirmative steps of

concealment, there must be evidence that the steps were

planned or at least contemplated prior to the commission of

the offense. The government, on the other hand, contends

that significant steps to conceal an offense after it has
 

been committed will warrant an enhancement for more than

minimal planning.

 In arguing that there most be some pre-offense

planning, defendant relies primarily on United States v.
 

 -11-

Maciaga, 965 F.2d 404 (7th Cir. 1992). In Maciaga, a bank
 

security guard stole a bag of cash from the bank's night

deposit safe. To deflect suspicion from himself, the guard

told investigating authorities that he had been having

problems with night deposit bags becoming stuck in the chute.

The sentencing judge enhanced the guard's sentence for more

than minimal planning, finding that the false statements to

investigators constituted significant affirmative steps to

conceal the larceny. In reversing the enhancement, the

Seventh Circuit noted that "[w]hen the enhancement has been

applied because a defendant has taken significant steps to

conceal the offense, evidence of some pre-offense planning of
 

the concealment has been present." Id. at 407. The court
 

then held that the guard's false story to investigators

amounted to no more than the "'logical' step of discouraging

an investigation," and did not constitute more than minimal

planning. Id. at 408.
 

 We are unwilling to go so far as the Seventh

Circuit in requiring direct evidence of pre-offense planning

of the concealment. It is true that U.S.S.G.

 2F1.1(b)(2)(A) indicates that the offense itself must

"involve" more than minimal planning. We recognize there may

be situations where a defendant's subsequent cover-up

activity is so disassociated from the earlier crime as to

make it unreasonable to find that the crime itself "involved"

 -12-

more than minimal planning. But we believe the determination

is essentially one of fact for the district court. Crimes of

fraud and deceit by their very nature may, and often do,

compel, quite predictably, later efforts at a cover-up. Thus

defendant here, having put his name and address on the check,

knew that he would probably be later questioned by

authorities, at which time he would necessarily have to offer

some innocent explanation. It is not unreasonable to view

the false story he eventually told, and the elaborate steps

he took to support it, as integral to the original offense

itself, so that the offense can properly be said to have

"involved" this later cover-up activity. That interpretation

is the one most consistent with Application Note 1(f), which

expressly includes within "[m]ore than minimal planning . . .

significant affirmative steps . . . taken to conceal the

offense." The application notes, while not conclusive,

demand considerable deference. United States v. Weston, 960
 

F.2d 212, 218 (1st Cir. 1992). We are less ready, therefore,

than the Maciaga court to require direct proof of "some pre-
 

offense planning of the concealment" where, as here, the

necessity to conceal was so integral to the entire scheme.

Maciaga, 965 F.2d at 407 (emphasis deleted).
 

 In the instant case, moreover, defendant's cover-up

was far more elaborate and better planned than in Maciaga.
 

He did not merely "take the 'logical' step of discouraging an

 -13-

investigation" by telling a false story to police. See id.
 

at 408. Rather, defendant recruited a friend, Massey, to

corroborate his own false story by repeating the same tale to

investigators. Defendant also took investigators on a wild

goose chase throughout the streets of Central Falls and

Providence, searching for the mythical Italian man who sold

him the car and the elusive Hispanic man to whom defendant

allegedly sold the car. These additional steps make

defendant's attempted concealment much more "significant" and

"affirmative" than those taken by the security guard in

Maciaga. Under such circumstances, we cannot say that the
 

district court clearly erred in enhancing defendant's

sentence for more than minimal planning, regardless of the

lack of any direct evidence that the cover story had been

planned prior to the offense.2

 

2. This conclusion is further buttressed by the reference in
Application Note 1(f) to the obstruction of justice
enhancement, U.S.S.G. 3C1.1. Application Note 1(f)
expressly provides that significant affirmative steps to
conceal will not constitute more than minimal planning when 
3C1.1 applies to the conduct. We think this reference to 
3C1.1 reflects implicit recognition that significant
affirmative post-offense steps to conceal can, in certain
circumstances, constitute either more than minimal planning
under 2F1.1(b)(2)(A) or an obstruction of justice under 
3C1.1. As the district court recognized, the exclusion in
Application Note 1(f) of conduct to which 3C1.1 applies is
intended to avoid the double counting that would result if
courts treated the same post-offense concealment as both more
than minimal planning and obstruction of justice. See United
 
States v. Werlinger, 894 F.2d 1015, 1016-17 (8th Cir. 1990)
 
(defendant's attempt to recruit co-workers to tell false
story to auditors of bank constituted further attempts to
conceal his embezzlement and, therefore, could not constitute

 -14-

 The judgment of the district court is affirmed.
 

 Concurrence and Dissent

follows.

 

an obstruction of justice under 3C1.1).
 Insofar as our dissenting colleague suggests that the
cover-up here falls exclusively within the definition of
obstructing justice, we note that, according to the
government, defendant's conduct would not have been covered
by 3C1.1, since it did not significantly impede or obstruct
the official investigation or prosecution of the offense.
U.S.S.G. 3C1.1, Application Note 3(g). It was not,
therefore, "conduct to which 3C1.1 . . . applies," quite
apart from the fact that defendant was never charged
thereunder and double-counting was never a question.

 -15-

BOWNES, Senior Circuit Judge, concurring and dissenting:
 

 I agree with the court that the district judge did

not abuse his discretion in excluding Mrs. Amaral's proffered

testimony. Regretfully, I cannot agree with my brothers in

approving a two-level increase in the offense level based on

a finding that there was more than minimal planning by the

defendant. This ruling is contrary to the guideline itself

as well as common sense and logic.

 A sentencing increase for "more than minimal

planning" under U.S.S.G. 2F1.1(b)(2) based upon post-

offense conduct is an issue of first impression in this

circuit. Previously, when we have found more than minimal

planning for purposes of approving a sentencing increase, the

offense itself involved significant planning. See, e.g.,
 

United States v. Resurreccion, 978 F.2d 759, 763 (1st Cir.
 

1992) (transporting forged securities into the United

States); United States v. Rust, 976 F.2d 55, 57 (1st Cir.
 

1992) (falsifying many travel vouchers submitted for

reimbursement to the State of Massachusetts over a four year

period); United States v. Tardiff, 969 F.2d 1283, 1288-89
 

(1st Cir. 1992) (falsifying financial records for several

years to hide losses in investment pool); United States v.
 

Gregorio, 956 F.2d 341, 343-44 (1st Cir. 1992) (filing false
 

residential mortgage loan documents with a federally insured

 -14-
 14

bank ); United States v. Fox, 889 F.2d 357, 361 (1st Cir.
 

1989) (obtaining two fraudulent bank loans). In this case,

neither the district court nor the majority found that the

defendant's offense, forging the payees' names on a stolen

check and then writing his own name and address on the check

in order to deposit it in a newly-created bank account,

required more than minimal planning.3 The district court

enhanced the defendant's offense level based on his attempts

to mislead investigators long after the offense had been

committed.

 The guideline provides for a two-level increase

"[i]f the offense involved (A) more than minimal planning[.]"

U.S.S.G. 2F1.1(b)(2). The application notes following the

guideline refer to the Commentary to 1B1.1, General

Application Principles, for the definition of "more than

minimal planning." As the majority noted, the commentary

explains that, "'More than minimal planning' also exists if

significant affirmative steps were taken to conceal the

 

3. The presentence report prepared by the Rhode Island
probation department recommended the two-level increase for
"more than minimal planning" pursuant to U.S.S.G. 
2F1.1(b)(2) based on conduct of the offense: opening a bank
account to deposit the stolen check, depositing the check,
withdrawing all of the funds, and never using the account
again. Defense counsel objected, and the district court
agreed that the conduct relied upon in the presentence report
did not constitute "more than minimal planning." The court
went on to find, however, that the defendant's false story
after the offense involved "more than minimal planning" and
imposed the two-level increase based on that finding.

 -15-
 15

offense, other than conduct to which 3C1.1 (Obstructing or

Impeding the Administration of Justice) applies." U.S.S.G.

 1B1.1, Application Note 1(f). Reading the definition into

the guideline, it seems clear to me that the focus remains on

conduct preceding and involving the offense. Attempts to

conceal the offense, which are planned and occur after the

offense, fall within the definition of obstructing justice,

and should not be considered for purposes of a sentencing

increase for "more than minimal planning."4 The majority

points out correctly that in this case the defendant's

concocted story did not significantly impede or obstruct the

official investigation or prosecution of the case and,

therefore, U.S.S.G. 3C1.1 would not apply. This, however,

does not justify imposing a two-level increase by distorting

the meaning of the "more than minimal planning" guideline. 

 I do not think we should disregard common sense,

logic, and the plain meaning of words when we enter the

labyrinth of the sentencing guidelines. "Plan" is defined in

the dictionary as "a scheme or method of acting, doing,

proceeding, making, etc., developed in advance." Random
 

House Dictionary of the English Language 1480 (2nd Ed.

Unabridged 1987) (emphasis added). I agree with the Seventh

 

4. The presentence report did not recommend an increase
based on obstructing justice, U.S.S.G. 3C1.1. At the
sentencing hearing, the government admitted that the
defendant's story had not misled the investigation. 

 -16-
 16

Circuit that a story concocted after the offense, false as it

may be, should not be included within the term "more than

minimal planning," unless there is some evidence that the

story was fabricated as part of the pre-offense planning.

United States v. Maciaga, 965 F.2d 404, 407-08 (7th Cir.
 

1992). 

 In this case, the defendant told a false story, and

recruited a friend to help mislead the investigation more

than a year after he committed the offense. I have examined

the presentence report, and the record of the sentencing

hearing and have found no evidence that the defendant

concocted the story before the offense, but waited until the

investigation began to put his plan into action, as the court

seems to assume. In fact, the defendant did not contact his

friend until after the investigation had begun, 16 months

after the offense.5 Under the facts of this case, the

application of the "more than minimal planning" guideline was

error. It is contrary to the guideline and accompanying

commentary, and it completely distorts the meaning of the

word "planning."

 I respectfully dissent.

 

 5 At the sentencing hearing, the government
characterized the defendant's friend as "a recruit after the
crime."

 -17-
 17