**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James F. LEWIS, Defendant–Appellant.**

**No. 94–1317.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1994.

Decided Dec. 9, 1994.

Robert Lee Garrison (argued), Office of the U.S. Atty., Crim. Div., Fairview Heights, IL, for plaintiff-appellee.

Renee E. Schooley, Federal Public Defender (argued) and Phillip J. Kavanaugh, Office of the Federal Public Defender, East St. Louis, IL, for defendant-appellant.

Before CUDAHY and FLAUM, Circuit Judges, and GRANT, District Judge.*

CUDAHY, Circuit Judge.

James Lewis pleaded guilty to three charges involving stolen goods. The charges arose from a truck stop theft of some $70,000 worth of Oscar Mayer hot dogs. The district court sentenced Lewis to three concurrent twenty-seven month terms under the Sentencing Guidelines. The trial judge enhanced Lewis's sentence in two respects. First, he found that Lewis had employed "more than minimal planning" in the theft, thus requiring a two-level enhancement. U.S.S.G. § 2B1.1(b)(5)(A). Second, he determined that Lewis's truck driving acumen was a "special skill," warranting an additional two-level increase. U.S.S.G. § 3B1.3. Lewis appeals both determinations. Because we find the evidence sufficient to support the

* The Hon. Robert A. Grant, District Judge for the Northern District of Indiana, sitting by designa-   tion.

trial court's sentencing enhancements, we affirm.

## I.

James Lewis has been an over-the-road truck driver for upwards of twenty years. During that time, various trucking companies have employed him. His trucking runs have taken him over the highways of seven states, including Illinois and Missouri. He presently operates as an independent truck driver and owns his own truck tractor.

In January, 1992, Lewis was involved in the theft of $70,000 worth of frozen hot dogs. A truck trailer containing 38,400 pounds of meat was stolen from a truck stop in Troy, Illinois on January 23, 1992. The following day, Lewis sold the stolen meat to Jack Butler at Butler's Wholesale Grocery in Lebanon, Missouri. The stolen trailer was then abandoned in Kansas City, Missouri. About a month following the theft, a receipt documenting the sale was forged and faxed to Butler.

A Grand Jury indicted Lewis and his co-defendant Timothy Deckard on May 18, 1993. Count I charged both defendants with conspiracy to transport stolen goods. 18 U.S.C. § 371. Count II charged the defendants with the transportation of stolen goods. 18 U.S.C. § 2314. Count III charged both men with possession of stolen goods. 18 U.S.C. § 659. Lewis pleaded guilty to Counts I and III, and he entered an *Alford* plea to Count II.

Lewis disputes the extent of his involvement in the hot dog theft. He admits that he sold the stolen meat to Butler, but claims that his participation was limited to the sale of the goods. He asserts that he was involved in neither the actual theft of the hot dogs nor in the activities designed to cover up the theft. The trial court found otherwise. It relied on the deposition testimony of Lewis's sister-in-law, Deborah Deckard; the testimony of Jack Butler; a photocopy of a phone bill demonstrating the use of Lewis's calling card in Troy, Illinois; and the forged receipt documenting the sale.

This evidence indicated that Lewis and his brother-in-law, Timothy Deckard, left Springfield, Missouri, early on the morning of January 23rd. They were traveling in Deckard's truck tractor. They drove 235 miles down the highway to a truck stop in Troy, Illinois. There, they found the loaded truck trailer. They hooked the truck trailer to their tractor and left with the hot dogs.

On the evening of the theft, Lewis contacted Jack Butler of Butler's Wholesale Grocery at his home in Lebanon, Missouri. Lewis stated that he would drop by the next morning to determine whether or not Butler wanted to purchase some meat. The next morning, Lewis sold Butler the meat for an amount between $8,000 and $10,000 in cash. The two men then met Mrs. Deckard at a truck stop near Lebanon. Deckard handed his wife $4,000 in cash and two boxes of frozen franks. Before leaving, Mrs. Deckard observed Lewis removing what appeared to be a decal from the truck trailer. Later that evening, she learned that the two men had driven to Kansas City, Missouri, and were "waiting for the scales to close." The two men abandoned the stolen trailer in that area.

About a month after the theft, Butler began to receive inquiries from investigators. He immediately contacted Lewis and requested a receipt for the meat. Within hours of the telephone call, he received a copy of a forged receipt on his fax machine. According to Mrs. Deckard, Lewis appeared at her home with copies of several receipts and prevailed upon her to "fill out" at least one of these.

The district court held a sentencing hearing on February 4, 1994. In its view, the totality of the evidence warranted a finding that Lewis had engaged in "more than minimal planning" in the commission or concealment of the offense. The trial judge also determined that the use of Lewis's "special skill" as a truck driver warranted an additional enhancement. He therefore sentenced Lewis to three concurrent terms of 27 months each. Lewis now appeals the district court's sentencing determinations.

## II.

Lewis argues that the district court erroneously applied two enhancements to his sen-

tence. First, he alleges that the evidence is insufficient to support a finding that he engaged in more than minimal planning. Lewis claims not to have been involved in most of the activities that took place. He further asserts that the activities in question—even had he been involved in them—do not rise to the level demanded by the Sentencing Guidelines for a "more than minimal planning" enhancement. Second, Lewis disputes the two-level enhancement for the use of a "special skill." Skills necessary to drive an eighteen-wheeler, Lewis argues, are not "special" within the meaning of the Guidelines. Even if a truck driver's skills are special, he continues, the record fails to suggest that he used his knowledge.

■ As an initial matter, we note the standard of review that controls Lewis's factual disputes with the district court. We review a district court's factual findings for clear error. *United States v. Lennick,* 917 F.2d 974, 979 (7th Cir.1990); *United States v. Hubbard,* 929 F.2d 307, 310 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Lewis argues vehemently that neither the testimony of Mrs. Deckard nor that of Jack Butler is believable. Instead, he claims that the district court ought to have credited his testimony and that of Deckard: Both men stated that Lewis was not involved in any of the activities except the sale. His arguments must fail in light of the level of deference accorded a trial court's credibility determinations. The district judge was not obliged to accept Lewis's version of events. It was well within that judge's province to find either Butler's or Mrs. Deckard's story more plausible than that of Lewis. We refuse, on appeal, to substitute our own credibility assessments for those of the district court.

■ The district court might have facilitated the processes of appellate review, however, by specifying the particular factors that led it to enhance the sentence. Because "each fact found at the time of sentencing has a specific and inescapable consequence for the defendant's sentence," *United States v. Agyemang,* 876 F.2d 1264, 1275 (7th Cir. 1989) (Cudahy, J., concurring), specific fact-finding is often important. It both illumi-

nates the precise basis for the district court's sentence and avoids post-hoc sentencing rationales on the part of the government. In some instances, the failure to make subsidiary findings will necessitate remand. *See United States v. Jewel,* 947 F.2d 224, 236 (7th Cir.1991). However, if we are certain that "the district court focused on the matter with sufficient precision," no remand is necessary. *Id.*

In the present case, the judge made ultimate findings of fact when he applied enhancements "based on everything I have seen and heard about this crime." Although subsidiary findings would have been more helpful, *see Jewel,* 947 F.2d at 235–36, the trial court's failure to make them caused no significant harm here. The record contains evidence enough to support the trial court's determinations. *Id.* Future determinations, however, should be guided by precision whenever possible.

### A. The More Than Minimal Planning Enhancement

The district court may enhance a sentence given a finding that the defendant engaged in "more than minimal planning" in the commission or the concealment of the offense. U.S.S.G. § 2B1.1(b)(5)(A). The district court determined that the activities in the instant case involved planning sufficient to justify an increase under this section. We review this determination for clear error. *United States v. Maciaga,* 965 F.2d 404, 406 (7th Cir.1992); *Lennick,* 917 F.2d at 979. We will reverse only if left with "a definite and firm conviction" that a mistake has been made. *United States v. White,* 903 F.2d 457, 466 (7th Cir. 1990) (quoting *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989)).

■ Section 2B1.1 of the Sentencing Guidelines envisions a scheme of sentences and enhancements appropriate for various property crimes. Subsection (b)(5)(A) authorizes an enhancement "[i]f the offense involved more than minimal planning." To determine whether an offense involved the requisite level of planning, the section directs the reader to the Application Notes for § 1B1.1. Those notes provide some guidance

in construing the Guidelines' "minimal planning" language:

> "More than minimal planning" means more planning than is typical for commission of the offense in a simple form.
>
> "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense....
>
> "More than minimal planning" is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune....

U.S.S.G. § 1B1.1, *Application Note* 1(f); *see also Maciaga,* 965 F.2d at 406 (quoting the remainder of the Note). The Notes thus specify three distinct categories that justify enhancement—more planning than usual, significant steps to conceal the offense and repeated acts. *Maciaga,* 965 F.2d at 406. If the facts of a particular crime indicate that any of these factors is present, enhancement is appropriate. *Id.*

■ Lewis first argues that there is no evidence of "more than minimal planning" because the hot dog theft was a "simple" crime. His efforts, he asserts, lacked both artifice and finesse. He simply stole the hot dogs and sold them to a fence. Such an "average" theft, he claims, should not be the subject of a sentencing enhancement.

Lewis's argument has some appeal. It is hardly extraordinary to find that thieves know fences or sell stolen goods. In these respects, Lewis's crime might be considered "simple." Yet every crime necessarily consists of its basic elements. The most sophisticated theft, for instance, can be characterized as the "simple" taking of someone else's goods. Demanding that a court focus only upon these basic elements would transform every crime into a "simple" offense. To determine whether the enhancement should apply, however, the appropriate focus is not on a given crime's basics. Instead, the sentencing court should determine which aspects of a crime render it more serious or unusual than the average offense. *United States v. Bean,* 18 F.3d 1367, 1370 (7th Cir.1994) (urg-

ing a comparison of the particular circumstances of the offense in question to other offenses of its kind). This determination is necessarily fact-specific and largely a function of the trial court's discretion. *See White,* 903 F.2d at 466.

In the present case, a number of the following factors might have legitimately influenced the district court. First, that court might have been moved by the time frame during which the events in question took place. Accomplishing a crime in a rapid succession of steps gives rise to the inference that a defendant engaged in significant planning. *United States v. Jenkins,* 901 F.2d 1075, 1084 (11th Cir.), *cert. denied,* 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990). Here, Lewis and Deckard left early one morning with an empty truck tractor. They drove to a truck stop over two hundred miles away. Once there, they hitched a trailer loaded with several thousand pounds of meat to their empty truck tractor. That evening, they located a willing buyer for the meat. The next morning, they disposed of the stolen goods. The abbreviated time span during which these activities occurred may well evidence the sort of preplanning that justifies a sentencing enhancement. Although some expedition was necessary because the stolen product was perishable, we still find the speed with which the offense was committed a relevant consideration.

■ The district court might also have been persuaded that the various steps taken to conceal the theft justified enhancement. *See generally* U.S.S.G. § 1B1.1, *Application Note* 1(f). Lewis apparently tried to remove an identifying decal from the stolen trailer. On the day of the hot dog sale, Lewis and Deckard also traveled to a relatively distant city to dispose of the stolen trailer. In order to facilitate the cover-up, Lewis helped manufacture a receipt for the stolen goods. Again, the district court could have concluded that these activities provided the level of concealment that justifies enhancement under the Sentencing Guidelines.[1] *See, e.g.,*

---

1. Lewis argues that the facts of his case present no evidence of the preoffense planning of concealment that *Maciaga* seems to require, 965 F.2d at 407–08. We have stated, however, that a court can infer preoffense planning in some instances given the rapid completion of a series of criminal steps. Here, much of the concealment took place immediately following the sale of the

*Lennick,* 917 F.2d at 979 (holding enhancement appropriate where defendant, *inter alia,* procured a false receipt).

We do not wish to suggest that any of these findings, without more, is necessarily sufficient to support a sentencing enhancement for "more than minimal planning" in every instance. We hold only that the matter is soundly committed to the trial court's discretion. *White,* 903 F.2d at 466. Given the facts in the present case, we are not able to find an abuse of that discretion. The district court's conclusion that Lewis engaged in more than minimal planning to complete the hot dog theft is not obviously unreasonable.

## B.  *Enhancement for the Use of a Special Skill*

■ The district court may also enhance a sentence if it finds that the defendant employed the use of a special skill in the commission or concealment of an offense. U.S.S.G. § 3B1.3. The district court determined that the use of Lewis's skills as an over-the-road truck driver warranted an increase under this section. Factual findings under this section are reviewed for clear error. The legal meaning of "special skill" we determine *de novo.*  *Hubbard,* 929 F.2d at 310.

Section 3B1.3 provides an enhancement for the commission of criminal activities that require the use of a special skill. The section exists because such behavior, is considered "more culpable." U.S.S.G. § 3B1.3, *Application Note, Background.* The section defines a "special skill" as:

> ... a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

*Id., Application Note* 2. The notes thus require some differentiation from knowledge held by the average citizen.

■ Although no case has yet discussed the application of the section to truck driving, it requires no leap of logic to conclude that the skills necessary to operate an eighteen-wheeler justify enhancement under the section. An over-the-road commercially-employed truck driver is required to have a special operator's license. Members of the general public would have more than a little trouble successfully maneuvering a loaded eighteen-wheeler along roads and through parking lots. Defense counsel suggested at oral argument that anyone who can drive a car can pilot a big truck down the highway. Although ordinary driving skills may be sufficient to keep a big rig running on limited-access expressways, we seriously doubt whether the average citizen possesses the ability to guide a truck through tight spaces on city streets. Truck driving requires technical knowledge or ability that the average citizen does not possess. *See, e.g., United States v. Mettler,* 938 F.2d 764, 767 (7th Cir.1991) (holding that piloting skill constitutes a special skill for the purposes of enhancement).

■ Further, the fact that an average citizen *might be able* to accomplish a task is not dispositive. Enhancement is intended to apply if a defendant has special "education, training or licensing." U.S.S.G. § 3B1.3, *Application Note* 2. It may be that an average person can accomplish a task at which someone with special training or skill is adept. This does not, however, convert the activity in question into an ordinary or unspecialized activity. Perhaps an untrained person could keep a plane aloft for a period of time; this fact, without more, does not negate the "skilled" nature of piloting. When determining whether an enhancement for special skill should apply, an examination of the average person's potential to perform remarkable feats, while perhaps probative, does not end the inquiry. Instead, the skilled nature of a particular activity is determinative.

■ The conclusion that truck driving necessitates the use of a special skill only completes part of the analysis. A court must

stolen goods; an inference of planning is thus reasonable. *Maciaga* does not, in any case, require direct evidence of preoffense planning.

965 F.2d at 407 (discussing *Jenkins's* inference of planning).

also determine that a defendant actually used that special skill to "significantly" facilitate the commission or the concealment of the offense. U.S.S.G. § 3B1.3. The present record amply supports the conclusion that Lewis employed the specialized training of a truck driver during the theft and its concealment.

Lewis has been an over-the-road trucker for upwards of twenty years. He understands how to operate truck tractors and truck trailers, and he knows the ways of the road. The district court could have concluded that this knowledge significantly facilitated the hot dog theft and subsequent cover-up. Lewis probably knew where to find a loaded trailer. He had an awareness of trucking customs that facilitated the theft of a trailer from a public truck stop. He knew how to hook the trailer up to the tractor. He knew where to find a willing buyer for a suspicious load of frozen meat. He knew that the identifying decal needed to be removed from the side of the trailer. He understood that he needed to "wait for the scales to close" before disposing of the stolen trailer. When authorities began asking for receipts, he had access to receipts typical in the trade and knew how to explain the discounted price. Lewis thus used the specialized knowledge he possessed as a truck driver. For that reason, the district court's application of a sentencing enhancement for use of a special skill was appropriate.

### III.

James Lewis participated in the heist of 38,400 pounds of frozen hot dogs. From the record before it, the district court could have concluded that Lewis engaged in more than minimal planning; we will not disturb this finding on appeal. Over-the-road truck driving is an activity requiring specialized skill and knowledge. The fact that Lewis had these abilities and understood the ways of the road significantly facilitated both the commission and the concealment of the hot dog theft. For those reasons, the district court properly applied sentencing enhancements.

The judgment of the district court is therefore AFFIRMED.