BREYER, Chief Judge.
 

 Cesar Resurrección appeals his conviction (and subsequent sentence) for “transport[ing] in interstate or foreign commerce ... securities” that he knew had “been falsely made, forged, or counterfeited.” 18 U.S.C. § 2314. We find his contentions without merit and affirm both conviction and sentence.
 

 I
 

 Background
 

 The basic facts, as demonstrated by the evidence introduced at trial, are the following:
 

 
 *761
 
 a. On December 19, 1990, Resurrección, a resident of Los Angeles, arrived at Logan Airport, Boston, on a flight from Germany.
 

 b. Customs agents found in Resurrec-cion’s possession six cashier’s checks and two demand drafts, all apparently issued by the Bank Utama in Malaysia. The checks and drafts had a total face value of more than $18 million.
 

 c. Resurrección testified that the checks and drafts were to be used “for discounting,” that he hoped “to get 80 percent of the face amount” of the checks, and that he might “accept as little as 40 percent” of face value.
 

 d. An official of Bank Utama testified that the checks and drafts were forgeries; they were not instruments of the Bank Utama.
 

 The jury convicted Resurrección. The court sentenced him to a prison term of 51 months to be followed by three years of supervised release. And, as we said, Re-surrección now appeals his conviction and his sentence.
 

 II
 

 The Conviction
 

 1.
 
 Sufficiency of the Evidence.
 
 Resurrección points out that the statute, 18 U.S.C. § 2314, makes it an offense “knowingly” to transport forged or counterfeit instruments. He adds that the evidence introduced at trial was insufficient to show that he
 
 knew
 
 the instruments were not genuine. The government, however, pointed out to the jury that Resurrección intended to obtain 40% to 80% of the checks’ face value, and it asked why Resurrección would think he could only receive 40% to 80% of the checks’ face value had he believed the checks were genuine. Valid cashier’s checks, after all, are negotiable for full value at the issuing bank. In addition, the government introduced a letter (dated two days after the date on the cashier’s checks), which customs agents found in Resurreccion’s briefcase. It said:
 

 This is it! Everyone of us is working very hard on this deal. The bank officer has to be take care of; the telecom guy co operation secured. Thesefore it is now vitally important that we would not foul up this time. I will fax you, on another sheet, the detail of fax for verification. Meantime, you must proceed to obtain from N.Y. the verbiage of the confirmation required, date and time settings etc. [sic.]
 

 The government also introduced into evidence a Logan Airport customs form on which Resurrección had falsely answered “no” to the question asking whether he was “carrying ... monetary instruments over $10,000 U.S. or foreign equivalent.” Finally, the jury might have disbelieved Resurreccion’s testimony that he had traveled to Germany in order to “broker between some people who are going to buy and sell cars,” particularly since Resurrec-ción, on his customs form, had stated that the purpose of his trip abroad was not “business,” but “pleasure.”
 

 Given the jury’s powers to assess credibility,
 
 see United States v. Angiulo,
 
 897 F.2d 1169, 1197 (1st Cir.),
 
 cert. denied,
 
 — U.S. —, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990), the totality of this evidence is sufficient to permit the jury to find, beyond reasonable doubt, that Resurrección had the requisite knowledge.
 

 2. .
 
 The Missing Witness.
 
 Resurrección argues that his conviction is fundamentally unfair and violates the Fifth Amendment, U.S. Const, amend. V, because he was unable to summon for his trial a potential witness, Abang Zaidi, a Bank Utama official in Malaysia who lives beyond the reach of compulsory process. He points out that a signature reading “Abang Zaidi” appears on a document found in Resurrección’s possession, a document that bears Bank Utama’s letterhead and says that certain numbered cashier’s checks “are authentic” and “will be honoured upon presentation at our counters.”
 

 The problem with this argument, however, is that Resurrección did not clearly explain to the court just how calling Zaidi would help him. Another Bank Utama official who appeared at the trial testified that the Zaidi signature was false. And, he identified as genuine other bank documents
 
 *762
 
 containing Zaidi’s signature, which apparently genuine signature does not even faintly resemble the signature on the bottom of Resurreccion’s letter. Under these circumstances, it seems likely that Zaidi, in person, would have hurt, not helped, Resur-reccion’s cause. Resurrección has provided neither this court, nor the district court, any good reason for believing the contrary.
 

 The Constitution does not automatically entitle a criminal defendant to unobtainable testimony.
 
 See United States v. Greco,
 
 298 F.2d 247, 251 (2nd Cir.)
 
 cert. denied,
 
 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962) (explaining that the right to compulsory process does not extend to witnesses beyond the subpoena power);
 
 United States v. Theresius Filippi,
 
 918 F.2d 244, 247 (1st Cir.1990). And, we can find nothing fundamentally unfair about convicting Resurrección without unobtainable testimony, the potential value of which is so highly speculative.
 
 See id.
 
 (explaining that defendant must make “some plausible showing” that the lost evidence is “both material and favorable” to the defense);
 
 United States v. Mount,
 
 896 F.2d 612, 621 (1st Cir.1990) (“Before the absence of defense witnesses can be said to violate either the right to compulsory process or due process, the defendant must show that the testimony from the missing witnesses would have been relevant, material, and favorable.”).
 

 Ill
 

 The Sentence
 

 The district court, in calculating Resur-reccion’s sentence, followed the Sentencing Guidelines instructions to' “Apply § 2F1.1 (Fraud and Deceit).” U.S.S.G. § 2B5.2 (“Forgery: Offenses Involving ... Counterfeit Instruments Other than ... Obligations of the United States”);
 
 see
 
 U.S.S.G.App. A, instruction for applying 18 U.S.C. § 2314 (the statute of conviction). The court, following the Fraud Guideline, began with a base level of 6,
 
 see
 
 U.S.S.G. § 2Fl.l(a), added fifteen levels for a “loss” of between $10 million and $20 million,
 
 see
 
 U.S.S.G. § 2Fl.l(b)(l)(P), and added two more levels for “more than minimal planning,” U.S.S.G. § 2F1.1(b)(2)(A). The resulting 23 levels, along with Resurreccion’s criminal history category of I, produced a Guideline sentencing range of 46 to 57 months,
 
 see
 
 U.S.S.G. Ch. 5, Pt. A, sentencing table. The court imposed a mid-range sentence of 51 months imprisonment. Re-surrección raises four objections to this calculation.
 

 1. Resurrección says that the court’s calculation of a $10 million to $20 million “loss” was improper because (1) there was no actual loss, (2) there was no known victim, and (3) there was, at most, a “risk of harm” that a court cannot use- to calculate “loss.” As to the first point, (and as Resurrección concedes) a Fraud Guideline “loss” includes as a countable “loss,” not only an
 
 actual
 
 loss, but also an
 
 “intended
 
 loss,” U.S.S.G. § 2F1.1. comment, (n. 7) (emphasis added), which “need not be precise,”
 
 id.
 
 at n. 8, and which “figure w[ill] be used if it [i]s larger than the actual loss.”
 
 Id.
 
 at n. 7. Indeed, the Guideline provides as an illustration that if a defendant “representad] that a forged check for $40,000 was genuine, the loss would be treated as $40,000.”
 
 Id.
 
 The district court could reasonably have concluded that Resurrección had intended to use the forged instruments to obtain between $10 million and $20 million from someone, for Resurrección testified that he had hoped to “discount” the checks at 80% of their face value ($18 million), but that he might have had to accept less. This intention to sell the checks for $10 million to $20 million would have represented an eventual intended “loss” of that amount to someone, since Resurrección knew that Bank Utama would never have honored the checks.'
 

 As to the second point, the Guidelines do not require a court specifically to identify a particular victim. That there likely are such victims, or that the defendant intends them to exist, is often sufficient to show a likely actual, or intended, loss.
 

 As to the third point, Resurrección bases his argument (that a “risk” of harm should not be included in loss calculations) upon
 
 *763
 
 commentary to a different guideline, namely the “Relevant Conduct” Guideline, U.S.S.G. § 1B1.3. comment, (n. 4). That note says:
 

 If, ... the guideline refers only to harm sustained ... or to actual, attempted or intended harm
 
 (e.g.,
 
 § 2F1.1 ...), the risk created enters into the determination of the offense level only insofar as it is incorporated into the base offense level.
 

 Id.
 
 The note then adds:
 

 Unless clearly indicated by the guidelines, harm that is merely risked is not to be treated as the equivalent of harm that occurred.
 

 Id.
 
 This language, however, does not help Resurrección, for it refers to “risks” of harm
 
 other than
 
 “intended harm,” which (in the case of fraud) the relevant guideline
 
 does
 
 “clearly indicate[]” is to be counted. This commentary means (a) to avoid a kind of double counting (say, adding punishment for risk of injury from a gun over and above what the robbery guideline specifically provides for carrying a gun,
 
 see
 
 U.S.S.G. § 2B3.1(b)(2)) and (b) to avoid a court’s using a standard that differs from the standard a specific guideline provides (say, adding punishment for a
 
 risk
 
 that a fraud will destroy a financial institution when the relevant guideline provides a two level increase for a fraud that
 
 “substantially jeopardized
 
 the safety and soundness of a financial institution,” U.S.S.G. § 2Fl.l(b)(6) (emphasis added)).
 

 Resurrección cites in support of his arguments
 
 United States v. Kopp,
 
 951 F.2d 521 (3rd Cir.1991). In that case, an offender fraudulently obtained a loan of about $14 million from a bank, while pledging valuable security to the bank. The offender defaulted, the bank foreclosed, and, in the process, the bank allegedly lost about $3.5 million.
 
 See id.
 
 at 522. The Third Circuit held that the $14 million amount of the loan approximated neither the actual, nor the intended, “loss” from the fraud, because sale of the security pledged by the offender had prevented a bank loss of the full $14 million.
 
 See id.
 
 at 524-25, 536. We do not see how
 
 Kopp
 
 is relevant here, for unlike the offender there, who pledged valuable security that mitigated the loss caused by his fraud, Resurrección had intended to sell completely worthless securities that would have created a loss equal to the ¿full price at which he planned to sell them.
 

 2. Resurrección says that the district court should not have increased his offense two levels for “more than minimal planning.” U.S.S.G. § 2F1.1(b)(2)(A). The offense at issue here, however, obviously involved a complex plan, and we can find no “clear error.”
 
 United States v. Gregorio,
 
 956 F.2d 341, 343-44 (1st Cir.1992).
 

 3. Resurrección says that the district court should have given him a two level reduction because he was a “minor participant.” U.S.S.G. § 3B1.2(b). Given the letters found in Resurreccion’s briefcase, however, and the other evidence recited above, the district court lawfully could have found, as it did, that Resurrección “was no mere mule here, but a critical player in a wide-ranging fraud scheme.” There is no “clear error.”
 
 United States v. Akitoye,
 
 923 F.2d 221, 227 (1st Cir.1991).
 

 4. Resurrección says that the district court should have given him a two level reduction because of his “acceptance of responsibility.” U.S.S.G. § 3E1.1. The district court, which has broad discretionary power in awarding, or denying, this reduction,
 
 see United States v. Bradley,
 
 917 F.2d 601, 606 (1st Cir.1990), determined, in light of Resurreccion’s claims of innocence and testimony that the district court found “essentially perjurious,” that he had not accepted responsibility for the crime. There is no legal error.
 

 The judgment of the district court is
 

 Affirmed.