USCA1 Opinion

 

 February 24, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1944 UNITED STATES OF AMERICA, Appellee, v. MICHAEL W. BEAUCHAMP, Defendant, Appellant. ____________________ ERRATA SHEET The opinion of this Court issued on February 16, 1993, is amended as follows: On page 16, last line of footnote 4, replace "mislead" with "misled". February 16, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1944 UNITED STATES OF AMERICA, Appellee, v. MICHAEL W. BEAUCHAMP, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Campbell and Bownes, Senior Circuit Judges. _____________________ ____________________ David L. Martin, by Appointment of the Court, for appellant. _______________ Lawrence D. Gaynor, Assistant United States Attorney, with whom ___________________ Lincoln C. Almond, United States Attorney, was on brief for the United _________________ States. ____________________ February 16, 1993 ____________________ CAMPBELL, Senior Circuit Judge. _________________________________ Defendant/appellant, Michael W. Beauchamp, appeals from his conviction in the United States District Court for the District of Rhode Island for uttering and publishing a forged United States Treasury check and for aiding and abetting others in uttering and publishing the check in violation of 18 U.S.C. 510(a)(2) and 2. Defendant raises two arguments on appeal: (1) the district court abused its discretion by refusing to allow defendant to present testimony impeaching the credibility of a witness; and (2) the district court clearly erred in concluding that the offense involved more than minimal planning under U.S.S.G. 2F1.1(b)(2)(A). Finding no error, we affirm. I. I. On December 4, 1991, defendant was indicted and charged with uttering and publishing a forged treasury check and aiding and abetting others in uttering and publishing the check in violation of 18 U.S.C. 510(a)(2) and 2. After defendant's first trial ended in a mistrial, the case proceeded to trial again on May 18, 1992. The evidence indicated that on May 4, 1990, the Internal Revenue Service mailed a tax refund check in the amount of $2006.20 to Francisca and Domingo Franco of Central Falls, Rhode Island. The Francos never received their check. Instead, on May 17, 1990, defendant deposited the Francos' -3- refund check in a checking account he had opened two days earlier at a Fleet Bank branch in Lincoln, Rhode Island. The back of the refund check was endorsed "Domingo Franco" and "Francisco (sic) D. Franco." Underneath the endorsements, which were forged, defendant signed his own name and address. No other deposits were made to the account, which reached a zero balance on June 5, 1990. The account was closed on July 16, 1990. In May of 1991, the Providence office of the United States Secret Service began an investigation into possible fraud in the negotiation of the Francos' refund check. As defendant's name and address were on the back of the check, Special Agent Rudolph Rivera contacted him. Defendant admitted to having signed his name on the back of the check, but stated that he had been handed the check by a Hispanic man as partial payment for a car. According to defendant, an acquaintance of his, named Joseph Massey, had brought the Hispanic man to defendant to buy the car. Defendant claimed that the Hispanic man had identified himself as the payee on the refund check. Special Agent Rivera obtained from the defendant exemplars of the defendant's handwriting. After examining these, Rivera concluded that defendant's handwriting was dissimilar from the forged signatures. -4- In late July, 1991, Fleet Bank contacted Detective William Carnes of the Lincoln, Rhode Island, Police Department concerning the Francos' refund check. After an interview with defendant in which defendant repeated his story with minor variations, defendant, Detective Carnes, and another police officer traveled to Central Falls in search of the Hispanic man to whom defendant had allegedly sold the car, as well as to Union Avenue in Providence to search for an "Italian guy" who allegedly had sold the car to defendant. Their search was unsuccessful. Detective Carnes located Joseph Massey and obtained Massey's agreement to speak to Special Agent Rivera about the case. In a written statement, Massey corroborated defendant's story about the Hispanic man. After federal investigators recontacted Massey in February 1992, Massey admitted that his prior written statement was false. Massey testified for the government at trial. He admitted on direct examination that he had been convicted once for forging a welfare check and twice for larceny of a motor vehicle. Massey testified that on August 1, 1991, defendant went to Massey's wife's house and told Massey that he was in trouble about a check. During this conversation, defendant asked Massey to tell the police the story about the Hispanic man. Massey agreed because he believed defendant was threatening him. -5- Defendant was denied permission to call as a witness Zelmare Amaral, the landlady of 101 Carpenter Street, Pawtucket, Rhode Island. Defendant sought to introduce Mrs. Amaral's testimony primarily to impeach Massey's testimony that he lived at the 101 Carpenter Street address. Mrs. Amaral had testified at the first trial that Massey's brother and sister, not Massey, resided at 101 Carpenter Street, although she acknowledged having seen Massey there. The court would not allow Mrs. Amaral to testify, saying defendant was merely seeking to impeach Massey on a "very collateral" matter. The jury returned a guilty verdict and defendant was sentenced to 11 months imprisonment. This appeal followed. II. II. A. Impeachment on Collateral Matters A. Impeachment on Collateral Matters _________________________________ Defendant contends the district court abused its discretion when it precluded Mrs. Amaral from taking the stand to contradict Massey's testimony that he lived at 101 Carpenter Street. Defendant points to Supreme Court authority that a defendant is entitled to cross-examine a witness as to his or her name and address. See Smith v. ___ _____ Illinois, 390 U.S. 129, 131 (1968); Alford v. United States, ________ ______ _____________ 282 U.S. 687, 693 (1931). Defendant concedes, as he must, that the district court permitted him to cross-examine Massey -6- on his address. Defendant contends, however, that the value of his right to ask Massey where he lives for the purpose of "exposing falsehood" is vastly diminished if defendant cannot also present extrinsic evidence demonstrating that Massey has lied. Defendant additionally argues that, quite apart from the value of Mrs. Amaral's testimony to impeach Massey by contradiction, the proffered testimony was relevant to expose Massey's motive to testify falsely. We find neither argument persuasive. It is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter.1 E.g., United States v. Pisari, 636 F.2d ____ ______________ ______ ____________________ 1. The government argues that Mrs. Amaral's testimony is barred by Rule 608(b) of the Federal Rules of Evidence, which expressly precludes the use of extrinsic evidence solely to impeach a witness's credibility. The rule states in relevant part: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." Like the general rule barring the use of extrinsic evidence to impeach a witness on a collateral matter through contradiction, the purpose of Rule 608(b)'s prohibition of extrinsic evidence is to avoid holding mini-trials on irrelevant or collateral matters. E.g., United States v. Ciampaglia, 628 F.2d 632, ____ _____________ __________ 641-42 (1st Cir.), cert. denied, 449 U.S. 956 (1980); United ____________ ______ States v. Martz, 964 F.2d 787, 789 (8th Cir.), cert. denied, ______ _____ ____________ 61 U.S.L.W. 3435 (1992). In the present context, however, it is difficult to conceptualize the actual location of Massey's residence as being a "specific instance of conduct" within the meaning of Rule 608(b). See United States v. Tarantino, ___ _____________ _________ 846 F.2d 1384, 1409 (D.C. Cir.) (Rule 608(b) addresses conduct indicative of untruthfulness, such as fraudulent and dishonest behavior), cert. denied, 488 U.S. 867 (1988); _____________ United States v. Opager, 589 F.2d 799, 801 (5th Cir. 1979) ______________ ______ (same). Like the district court, we think guidance is to be found in the more general rule as to collateral matters. -7- 855, 859 (1st Cir. 1981); 1 McCormack on Evidence 45, at _____________________ 169 (4th ed. 1992). Thus, it is often said that when a witness testifies to a collateral matter, the examiner "must take [the] answer," i.e., the examiner may not disprove it by extrinsic evidence. E.g., United States v. Martz, 964 F.2d ____ _____________ _____ 787, 789 (8th Cir.), cert. denied, 61 U.S.L.W. 3435 (1992); ____________ United States v. Young, 952 F.2d 1252, 1259 (10th Cir. 1991); _____________ _____ 1 McCormack on Evidence 45, at 170. A matter is considered _____________________ collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." 1 McCormack on Evidence _____________________ 45, at 169. Stated another way, extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence. See United States v. Tarantino, ___ _____________ _________ 846 F.2d 1384, 1409 (D.C. Cir.) ("The 'specific contradiction' rule . . . is a particular instance of the trial court's general power under Fed. R. Evid. 403 to exclude evidence 'if its probative value is substantially outweighed . . . by considerations of undue delay, [or] waste of time.'"), cert. denied, 488 U.S. 867 (1988); Pisari, 636 ____________ ______ F.2d at 858; 3 Weinstein's Evidence, 607[5], at 607-79, -80 ____________________ (1992). To the extent Mrs. Amaral's testimony merely went to -8- Massey's credibility by demonstrating a contradiction on an immaterial matter, it was clearly excludible. Defendant contends that testimony as to Massey's residence was not merely collateral, but was relevant and admissible for a purpose other than impeaching Massey's general character for truthfulness or untruthfulness through contradiction. According to defendant, Massey's insistence that he lived at 101 Carpenter Street in Pawtucket and not at his wife's house on Pine Street in Central Falls, could have been viewed as an attempt to distance himself from the forged check, which had originally been mailed to the Francos' residence in Central Falls. According to defendant, Massey's alleged falsehood concerning his residence would thus expose a motive to shift culpability for stealing the check from himself to defendant. But while a witness's self-interest or motive to testify falsely is generally considered to be a non- collateral issue, United States v. Rios Ruiz, 579 F.2d 670, _____________ _________ 673 (1st Cir. 1978) (bias); United States v. Calle, 822 F.2d _____________ _____ 1016, 1021 (11th Cir. 1987) (self-interest in testifying), we think the district court was entitled to conclude that the "marginal relevance" of Mrs. Amaral's proposed testimony was outweighed by the "time and effort" it would entail to present this testimony. As noted by the district judge, who presided over defendant's first trial, Mrs. Amaral's -9- testimony was inconclusive. She testified that she occasionally saw Massey, a truck driver, at 101 Carpenter Street, but that his brother and sister paid the rent. Moreover, as the district court noted, Pawtucket is adjacent to Central Falls; therefore, whether Massey lived at his siblings' house in Pawtucket or his wife's house in Central Falls said little about Massey's personal involvement in the crime, particularly since there had already been testimony that Massey spent at least some time at both locations. Under the circumstances, we cannot say that the district court abused its discretion in excluding Mrs. Amaral's proposed testimony concerning whether Massey lived at 101 Carpenter Street. B. More Than Minimal Planning B. More Than Minimal Planning __________________________ Defendant next argues that the district court clearly erred when it increased defendant's offense level by two levels, having determined that his offense involved more than minimal planning under U.S.S.G. 2F1.1(b)(2)(A). Section 2F1.1(b)(2)(A), which governs offenses involving fraud or deceit, states that if an offense involves more than minimal planning, the offense level should be increased by two levels. Application Note 1(f) of the commentary to U.S.S.G. 1B1.1 defines what constitutes more than minimal planning. It states, in part, the following: "More than minimal planning" also exists if significant affirmative steps were -10- taken to conceal the offense, other than conduct to which 3C1.1 (Obstructing or Impeding the Administration of Justice) applies. Relying on the above-quoted passage, the district court enhanced defendant's offense level for more than minimal planning on the basis of defendant's attempts to mislead investigators with his false story which he got Massey to corroborate about a Hispanic man. We review the district court's enhancement for more than minimal planning only for clear error. E.g., United States v. Gregorio, 956 F.2d 341, ____ _____________ ________ 343 (1st Cir. 1992). On appeal, both parties focus their arguments on whether the "significant affirmative steps" to conceal mentioned in 1B1.1, Application Note 1(f), must take place before a defendant commits an offense for an enhancement ______ under 2F1.1(b)(2)(A) to apply. Defendant argues that in order for the more than minimal planning enhancement to be applied based on significant affirmative steps of concealment, there must be evidence that the steps were planned or at least contemplated prior to the commission of the offense. The government, on the other hand, contends that significant steps to conceal an offense after it has _____ been committed will warrant an enhancement for more than minimal planning. In arguing that there most be some pre-offense planning, defendant relies primarily on United States v. ______________ -11- Maciaga, 965 F.2d 404 (7th Cir. 1992). In Maciaga, a bank _______ _______ security guard stole a bag of cash from the bank's night deposit safe. To deflect suspicion from himself, the guard told investigating authorities that he had been having problems with night deposit bags becoming stuck in the chute. The sentencing judge enhanced the guard's sentence for more than minimal planning, finding that the false statements to investigators constituted significant affirmative steps to conceal the larceny. In reversing the enhancement, the Seventh Circuit noted that "[w]hen the enhancement has been applied because a defendant has taken significant steps to conceal the offense, evidence of some pre-offense planning of __ the concealment has been present." Id. at 407. The court _______________ ___ then held that the guard's false story to investigators amounted to no more than the "'logical' step of discouraging an investigation," and did not constitute more than minimal planning. Id. at 408. ___ We are unwilling to go so far as the Seventh Circuit in requiring direct evidence of pre-offense planning of the concealment. It is true that U.S.S.G. 2F1.1(b)(2)(A) indicates that the offense itself must "involve" more than minimal planning. We recognize there may be situations where a defendant's subsequent cover-up activity is so disassociated from the earlier crime as to make it unreasonable to find that the crime itself "involved" -12- more than minimal planning. But we believe the determination is essentially one of fact for the district court. Crimes of fraud and deceit by their very nature may, and often do, compel, quite predictably, later efforts at a cover-up. Thus defendant here, having put his name and address on the check, knew that he would probably be later questioned by authorities, at which time he would necessarily have to offer some innocent explanation. It is not unreasonable to view the false story he eventually told, and the elaborate steps he took to support it, as integral to the original offense itself, so that the offense can properly be said to have "involved" this later cover-up activity. That interpretation is the one most consistent with Application Note 1(f), which expressly includes within "[m]ore than minimal planning . . . significant affirmative steps . . . taken to conceal the offense." The application notes, while not conclusive, demand considerable deference. United States v. Weston, 960 _____________ ______ F.2d 212, 218 (1st Cir. 1992). We are less ready, therefore, than the Maciaga court to require direct proof of "some pre- _______ offense planning of the concealment" where, as here, the necessity to conceal was so integral to the entire scheme. Maciaga, 965 F.2d at 407 (emphasis deleted). _______ In the instant case, moreover, defendant's cover-up was far more elaborate and better planned than in Maciaga. _______ He did not merely "take the 'logical' step of discouraging an -13- investigation" by telling a false story to police. See id. _______ at 408. Rather, defendant recruited a friend, Massey, to corroborate his own false story by repeating the same tale to investigators. Defendant also took investigators on a wild goose chase throughout the streets of Central Falls and Providence, searching for the mythical Italian man who sold him the car and the elusive Hispanic man to whom defendant allegedly sold the car. These additional steps make defendant's attempted concealment much more "significant" and "affirmative" than those taken by the security guard in Maciaga. Under such circumstances, we cannot say that the _______ district court clearly erred in enhancing defendant's sentence for more than minimal planning, regardless of the lack of any direct evidence that the cover story had been planned prior to the offense.2 ____________________ 2. This conclusion is further buttressed by the reference in Application Note 1(f) to the obstruction of justice enhancement, U.S.S.G. 3C1.1. Application Note 1(f) expressly provides that significant affirmative steps to conceal will not constitute more than minimal planning when 3C1.1 applies to the conduct. We think this reference to 3C1.1 reflects implicit recognition that significant affirmative post-offense steps to conceal can, in certain circumstances, constitute either more than minimal planning under 2F1.1(b)(2)(A) or an obstruction of justice under 3C1.1. As the district court recognized, the exclusion in Application Note 1(f) of conduct to which 3C1.1 applies is intended to avoid the double counting that would result if courts treated the same post-offense concealment as both more than minimal planning and obstruction of justice. See United ___ ______ States v. Werlinger, 894 F.2d 1015, 1016-17 (8th Cir. 1990) ______ _________ (defendant's attempt to recruit co-workers to tell false story to auditors of bank constituted further attempts to conceal his embezzlement and, therefore, could not constitute -14- The judgment of the district court is affirmed. ______________________________________________ Concurrence and Dissent Concurrence and Dissent follows. follows. ____________________ an obstruction of justice under 3C1.1). Insofar as our dissenting colleague suggests that the cover-up here falls exclusively within the definition of obstructing justice, we note that, according to the government, defendant's conduct would not have been covered by 3C1.1, since it did not significantly impede or obstruct the official investigation or prosecution of the offense. U.S.S.G. 3C1.1, Application Note 3(g). It was not, therefore, "conduct to which 3C1.1 . . . applies," quite apart from the fact that defendant was never charged thereunder and double-counting was never a question. -15- BOWNES, Senior Circuit Judge, concurring and dissenting: ____________________ I agree with the court that the district judge did not abuse his discretion in excluding Mrs. Amaral's proffered testimony. Regretfully, I cannot agree with my brothers in approving a two-level increase in the offense level based on a finding that there was more than minimal planning by the defendant. This ruling is contrary to the guideline itself as well as common sense and logic. A sentencing increase for "more than minimal planning" under U.S.S.G. 2F1.1(b)(2) based upon post- offense conduct is an issue of first impression in this circuit. Previously, when we have found more than minimal planning for purposes of approving a sentencing increase, the offense itself involved significant planning. See, e.g., __________ United States v. Resurreccion, 978 F.2d 759, 763 (1st Cir. _____________ ____________ 1992) (transporting forged securities into the United States); United States v. Rust, 976 F.2d 55, 57 (1st Cir. _____________ ____ 1992) (falsifying many travel vouchers submitted for reimbursement to the State of Massachusetts over a four year period); United States v. Tardiff, 969 F.2d 1283, 1288-89 _____________ _______ (1st Cir. 1992) (falsifying financial records for several years to hide losses in investment pool); United States v. ______________ Gregorio, 956 F.2d 341, 343-44 (1st Cir. 1992) (filing false ________ residential mortgage loan documents with a federally insured -14- 14 bank ); United States v. Fox, 889 F.2d 357, 361 (1st Cir. _____________ ___ 1989) (obtaining two fraudulent bank loans). In this case, neither the district court nor the majority found that the defendant's offense, forging the payees' names on a stolen check and then writing his own name and address on the check in order to deposit it in a newly-created bank account, required more than minimal planning.3 The district court enhanced the defendant's offense level based on his attempts to mislead investigators long after the offense had been committed. The guideline provides for a two-level increase "[i]f the offense involved (A) more than minimal planning[.]" U.S.S.G. 2F1.1(b)(2). The application notes following the guideline refer to the Commentary to 1B1.1, General Application Principles, for the definition of "more than minimal planning." As the majority noted, the commentary explains that, "'More than minimal planning' also exists if significant affirmative steps were taken to conceal the ____________________ 3. The presentence report prepared by the Rhode Island probation department recommended the two-level increase for "more than minimal planning" pursuant to U.S.S.G. 2F1.1(b)(2) based on conduct of the offense: opening a bank account to deposit the stolen check, depositing the check, withdrawing all of the funds, and never using the account again. Defense counsel objected, and the district court agreed that the conduct relied upon in the presentence report did not constitute "more than minimal planning." The court went on to find, however, that the defendant's false story after the offense involved "more than minimal planning" and imposed the two-level increase based on that finding. -15- 15 offense, other than conduct to which 3C1.1 (Obstructing or Impeding the Administration of Justice) applies." U.S.S.G. 1B1.1, Application Note 1(f). Reading the definition into the guideline, it seems clear to me that the focus remains on conduct preceding and involving the offense. Attempts to conceal the offense, which are planned and occur after the offense, fall within the definition of obstructing justice, and should not be considered for purposes of a sentencing increase for "more than minimal planning."4 The majority points out correctly that in this case the defendant's concocted story did not significantly impede or obstruct the official investigation or prosecution of the case and, therefore, U.S.S.G. 3C1.1 would not apply. This, however, does not justify imposing a two-level increase by distorting the meaning of the "more than minimal planning" guideline. I do not think we should disregard common sense, logic, and the plain meaning of words when we enter the labyrinth of the sentencing guidelines. "Plan" is defined in the dictionary as "a scheme or method of acting, doing, proceeding, making, etc., developed in advance." Random ______________________ House Dictionary of the English Language 1480 (2nd Ed. Unabridged 1987) (emphasis added). I agree with the Seventh ____________________ 4. The presentence report did not recommend an increase based on obstructing justice, U.S.S.G. 3C1.1. At the sentencing hearing, the government admitted that the defendant's story had not misled the investigation. -16- 16 Circuit that a story concocted after the offense, false as it may be, should not be included within the term "more than minimal planning," unless there is some evidence that the story was fabricated as part of the pre-offense planning. United States v. Maciaga, 965 F.2d 404, 407-08 (7th Cir. ______________ _______ 1992). In this case, the defendant told a false story, and recruited a friend to help mislead the investigation more than a year after he committed the offense. I have examined the presentence report, and the record of the sentencing hearing and have found no evidence that the defendant concocted the story before the offense, but waited until the investigation began to put his plan into action, as the court seems to assume. In fact, the defendant did not contact his friend until after the investigation had begun, 16 months after the offense.5 Under the facts of this case, the application of the "more than minimal planning" guideline was error. It is contrary to the guideline and accompanying commentary, and it completely distorts the meaning of the word "planning." I respectfully dissent. ____________________ 5 At the sentencing hearing, the government characterized the defendant's friend as "a recruit after the crime." -17- 17