RENDERED: APRIL 16, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0880-MR

JUSTIN GRAVES, A MINOR BY AND THROUGH
HIS PARENTS, AND NEXT FRIENDS,
JENYCE GRAVES AND MICHAEL GRAVES                    APPELLANT


APPEAL FROM FAYETTE CIRCUIT COURT
v.                    HON. JOHN E. REYNOLDS, JUDGES
ACTION NO. 16-CI-02334


LANDON A. JONES, M.D.; JOHN-MICHAEL MCGAUGH, D.O.;
AND UNIVERSITY OF KENTUCKY MEDICAL CENTER (d/b/a
UK HEALTHCARE d/b/a UNIVERSITY OF KENTUCKY
HOSPITAL A.B. CHANDLER MEDICAL CENTER d/b/a
U.K. MEDICAL CENTER)                    APPELLEES


<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE: ACREE, CALDWELL, AND LAMBERT, JUDGES.

ACREE, JUDGE: Appellant, Justin Graves, by and through his parents, Jenyce

and Michael Graves, appeal from a judgment on jury verdict entered in favor of

Appellees Dr. Landon Jones and Dr. John-Michael McGaugh (collectively, "the doctors"). Graves further appeals the Fayette Circuit Court's October 5, 2016 order dismissing its complaint against Appellees University of Kentucky Medical Center ("UKMC") and University of Kentucky ("UK") (collectively "the UK Defendants") based on governmental immunity. After careful review, we affirm.

## FACTS AND PROCEDURAL HISTORY

On June 28, 2015, Graves began complaining to his mother of a headache and loss of appetite. Graves' condition worsened. On July 1, 2015, he was treated by a private physician, Dr. William Revelette. Graves was diagnosed with a probable viral infection and sent home. In the subsequent days, Graves' health deteriorated. On July 3, 2015, he was treated by Dr. Jennifer Wilson. Dr. Wilson noted Graves showed symptoms suggestive of a bacterial infection. Upon her recommendation, Graves was immediately taken to the University of Kentucky Pediatric Emergency Department ("UK PED").

Dr. Jones was the attending physician at UK PED and Dr. McGaugh was a resident physician under his supervision when Graves arrived. Graves' mother informed registration that his chief complaint was a bacterial infection. Dr. Jones testified he remembered examining Graves during triage to ensure there was no emergency, which was part of normal triage. The examination lasted approximately 3-5 minutes. Graves was then transferred to an examination room,

where he was treated further by Dr. McGaugh. The parties dispute the amount of time Dr. Jones spent examining Graves after triage.

Both Dr. Jones and Dr. McGaugh testified they found no signs of a bacterial infection. Rather, they concluded his symptoms were consistent with a viral infection. Graves was discharged approximately three hours after arriving at UK PED. He was prescribed Zofran and instructed to return if his condition worsened.

Graves' mother testified that the following day, his condition had worsened to the extent he was unable to dress himself and could barely talk. Graves was brought back to UK PED on July 5, 2015. A lumbar puncture and MRI was performed. The tests revealed Graves was suffering from a bacterial infection in his sinuses, which was later determined to be Streptococcus anginosus. Graves was scheduled to undergo emergency surgery the following day, however, by this point, he had already suffered multiple strokes resulting in severe injuries.

Graves filed a complaint, sounding in medical negligence, against Dr. Jones and Dr. McGaugh. It stated further claims against the UK Defendants. The UK Defendants moved to dismiss based on the doctrine of governmental immunity. The circuit court granted the motion. The doctors answered the complaint, denying all allegations of negligence. They also asserted the affirmative defense of comparative negligence, premised on Graves' parents delay

in returning him to UK PED. The doctors testified in deposition supporting their allegation.[1]

Approximately one month before the original trial date,[2] the doctors moved to amend their answer, seeking to withdraw the comparative negligence defense. They argued the depositions of their own expert witnesses revealed the delay in returning Graves to UK PED had no effect on his injury and, therefore, the defense was no longer viable. Graves opposed the motion. Upon hearing both sides, the circuit court granted the motion. It also excluded the parties from introducing testimony placing fault on Graves' parents, specifically the pre-trial statements made by the doctors, because the withdrawal of the comparative negligence defense rendered it irrelevant. Subsequently, the doctors filed supplemental answers to interrogatories, noting that upon review of expert depositions, they did not believe Graves' parents contributed to his injury.

Trial was held from April 15, 2019 through April 25, 2019. The parties presented conflicting expert testimony as to whether the doctors' treatment of Graves met the appropriate standard of care and whether Graves' injuries could

---

[1] Dr. McGuagh testified in deposition, "I think I should start by saying that I don't think that what has happened to Justin Graves is anyone's fault. If the question is was there negligence involved in the case then I would say that the only negligence that I've seen is failure to follow discharge instructions by the parents after discharge from the emergency room." Dr. Jones testified, "His situation is terrible, but I do believe that a delay could have potentially made a worse outcome."

[2] Trial was originally set in October, however, a mistrial was declared for failure to seat a jury.

have been prevented. The jury found in favor of the doctors. This appeal followed.

On appeal, Graves alleges multiple points of error. He asserts the circuit court erred by: (1) allowing the doctors to amend their answer and by excluding the doctors pre-trial statements placing fault on his parents; (2) requiring counsel to conduct *voir dire* of the entire venire at once; (3) allowing his triage nurse, Jamie Davenport, to offer undisclosed expert testimony; (4) permitting the doctors to call an undisclosed witness, James Daniel Moore, M.D.; (5) permitting Roger Humphries, M.D. to give expert testimony; (6) prohibiting him from cross-examining Dr. Humphries with deposition testimony of other doctors; and (7) dismissing his complaint against the UK Defendants on grounds of governmental immunity. We will address each issue in turn.

## ANALYSIS

***The circuit court did not err by granting the doctors' motion to amend.***

"[T]he decision to grant or deny leave to amend is ultimately left to the discretion of the trial court, which will not be disturbed absent an abuse of that discretion." *Nami Res. Co., L.L.C. v. Asher Land & Mineral, Ltd.*, 554 S.W.3d 323, 343 (Ky. 2018). Discretion is abused when found to be "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

CR[3] 15.01 details when a party may amend pleadings:

> A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

CR 15.01. Because the doctors moved to amend their answer well after the timeframe allowing them to amend as a matter of right, the circuit court was required to grant leave so long as justice required. In determining whether "justice so requires," we consider several factors, including "timeliness, excuse for delay, and prejudice to the opposite party." *Lawrence v. Marks*, 355 S.W.2d 162, 164 (Ky. 1961). And, we recognize that "delay alone is insufficient reason to deny a motion to amend." *Adkins v. Kirby Contracting, LLC*, No. 2016-CA-001545-MR, 2019 WL 1870691, at \*4 (Ky. App. Apr. 26, 2019), *review denied* (Ky. Oct. 24, 2019) (citation omitted).

Graves first asserts he was prejudiced by the amendment, because he exerted significant time and effort in exploring and preparing to defend against comparative negligence. We have no cause to doubt counsel spent substantial time exploring this defense; however, this does not establish prejudice to Graves' case.

---

[3] Kentucky Rules of Civil Procedure.

-6-

Stated otherwise, the time counsel spent did not prejudice his client's efforts to establish the merits of his own case. Neither did his opponent's decision after investigation and discovery, to abandon a defense. Doing so removed an obstacle, allowing focus on establishing the alleged tortfeasors' negligence rather than disproving that of the parents.

He next asserts "[i]t was unfair for [the doctors] to develop the entire case blaming [Graves' parents] for their son's injuries, and then withdraw the defense on the eve of trial when even their own experts did not support their claims." Graves notes the doctors filed their answer, asserting comparative negligence, in August 2016, but didn't seek to withdraw the defense until September 2018, one month before trial.

Although there is evidence suggesting the doctors could have removed their comparative negligence defense at an earlier stage of litigation, there is also evidence suggestive of an excuse for the delay. Discovery of expert witnesses was scheduled to be completed by August 7, 2018, slightly one month before the motion to amend. Although many of their experts rejected the defense prior to the end of discovery, the doctors retained the right to investigate the defense up until the closing. Regardless, we find any untimeliness in moving to amend did not amount to an abuse of discretion.

Graves relies on *Lawrence v. Marks*, 355 S.W.2d 162 (Ky. 1961) and *Hedges v. Neace*, 307 S.W.2d 564 (Ky. 1957) to support his position. In *Lawrence*, the defendant waited six months before moving to amend his complaint, raising the issue of capacity to sue. 355 S.W.3d at 163. That court held it was an abuse of discretion to allow the amendment, because the defendant deliberately waited until the statute of limitations had run before seeking leave to raise the defense, greatly prejudicing the plaintiff. *Id*. at 164. In *Hedges*, the defendant moved to amend his answer to introduce a new issue after trial had already commenced. 307 S.W.2d at 567. That court held it was not an abuse of discretion for the trial court to deny the motion to amend. *Id*. at 568.

Two distinctions can be drawn between the case at bar and the cases relied upon by Graves. First, in both cases, the moving parties sought to introduce a new issue. Here, the doctors did not attempt to introduce an issue, but to eliminate one. Second, the parties in *Lawrence* and *Hedges* were greatly prejudiced by the delay in moving to amend. As noted, Graves did not suffer any prejudice by either the amendment itself or the timing of the amendment. The circuit court did not abuse its discretion by granting the doctors leave to amend.

Next, Graves asserts the circuit court erred by not allowing him to impeach physicians with their prior deposition testimony suggestive of the parents' negligence in delaying Graves' return to the hospital. Specifically, he contends the

"pretrial change in sworn testimony by [the doctors] is directly relevant to [their] credibility." Graves cites *King v. Commonwealth*, which notes "[w]itness credibility is always at issue and relevant evidence which affects credibility should not be excluded." 276 S.W.3d 270, 275 (Ky. 2009). He also relies on *Baker v. Kammerer*, "[t]he credibility of a witness' relevant testimony is always at issue and the trial court may not exclude evidence that impeaches credibility even though such testimony would be inadmissible to prove a substantive issue in the case." 187 S.W.3d 292, 295 (Ky. 2006) (citation omitted). We find these cases work against Graves.

*King* and *Baker* both stand for the proposition that witness credibility on relevant issues are always at issue. Here, once the comparative negligence defense was removed, the primary question remaining for the jury was whether the doctors deviated from the appropriate standard of care. Any statement placing fault on Graves' parents became irrelevant, as it had no tendency to prove or disprove a deviation from the standard of care. Based upon the authorities cited by Graves, the credibility of a witnesses' irrelevant testimony is not at issue.

Relevant here is the collateral facts doctrine which states, "It is generally recognized that a witness may not be impeached with respect to a matter which is irrelevant and collateral to the issues in the action." *Simmons v. Small*, 986 S.W.2d 452, 455 (Ky. App. 1998) (citation omitted); *see Campbell v.*

*Commonwealth*, No. 2006-SC-000931-MR, 2009 WL 737004, at *5 (Ky. Mar. 19, 2009). "A matter is considered collateral if 'the matter itself is not relevant in the litigation to establish a fact of consequence, *i.e.*, not relevant for a purpose other than mere contradiction of the in-court testimony of the witness.'" *Simmons*, 986 S.W.2d at 455 (quoting *United States v. Beauchamp*, 986 F.2d 1, 4 (1st Cir. 1993)). This doctrine is consistent with the authorities relied upon by Graves.

We understand Graves' argument to be that the doctors were lying in deposition when they said the parents' delay in returning Graves to the hospital contributed to his injuries and, therefore, they were partly to blame. We cannot agree with this interpretation. The deposition testimony memorialized the opinions of the deponents when they had yet to read the opinions of their own expert witnesses, after which, their opinions changed. A change in opinion does not amount to a "lie" which questions a witness's truthfulness. We discern no abuse of discretion regarding this ruling by the circuit court.

***The circuit court did not err by conducting voir dire of the entire venire at once.***

Graves next argues he was prejudiced when the circuit court required the parties to conduct *voir dire* of the entire venire at once. Graves did not preserve this issue for appeal but requests palpable error review pursuant to CR 61.02. To warrant relief under CR 61.02, Graves must convince this Court his substantial rights were impacted by a decision of the circuit court that was so

palpably erroneous that a manifest injustice was the result. *Fraley v. Rice-Fraley*, 313 S.W.3d 635, 641 (Ky. App. 2010); CR 61.02. Even then, "if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006) (quoting *Graves v. Commonwealth*, 17 S.W.3d 858, 864 (Ky. 2000)).

In this case, a venire of approximately 71 potential jurors was assembled. *Voir dire* was conducted of the entire group. Graves asserts the result was that:

> numerous potential jurors never spoke, and many jurors were seated so far from counsel that it was impossible to examine their body language and other reactions. In addition, because jurors who would be eventually struck for cause remained on the venire even after making statements that led to their eventual dismissal, Plaintiffs needlessly spent additional time during *voir dire* on these jurors. That time could have been spent exploring the biases of jurors who did not speak or rarely responded. The end result was that Plaintiffs were forced to exercise their peremptory strikes among potential jurors about whom they knew little.

It is Graves' contention that the circuit court should have followed the jury selection process of the Kentucky Rules of Criminal Procedure which require the clerk to "draw from the jury box sufficient names of the persons selected and summoned for jury service to compose a jury as required by law. If one or more of

-11-

them is challenged, the clerk shall draw from the box as many more as are necessary to complete the jury." RCr[4] 9.30(1)(a).

In civil cases, "[i]t is well established that the trial court has broad discretion in conducting voir dire." *Reece v. Nationwide Mut. Ins. Co.*, 217 S.W.3d 226, 232 (Ky. 2007). This being a civil case, the circuit court was not obligated to follow the criminal rules. Unquestionably, what Graves describes does not constitute palpable error leading to a manifest injustice.

Graves' reliance on the circumstances and legal analysis in a criminal case, *Oro-Jimenez v. Commonwealth*, 412 S.W.3d 174 (Ky. 2013), has no persuasive value in our review of this civil case. Furthermore, we believe there is no substantial likelihood that a different *voir dire* process would have changed the makeup of the jury which found in favor of Dr. Jones by a margin of 10 to 2, and in favor of Dr. McGaugh by a margin of 11 to 1. We find no manifest injustice.

***The circuit court did not err by allowing Jamie Davenport to give testimony regarding the electronic medical record audit log.***

A key factual dispute at trial was the amount of time spent by, and involvement of, Dr. Jones in treating Graves after triage. In support of their respective positions, both parties used the audit log produced by UKMC's medical

---

[4] Kentucky Rules of Criminal Procedure.

record system, which timestamped when UKMC employees accessed Graves' medical record during his time at UK PED.

The audit log was introduced by the doctors during their cross-examination of Jamie Davenport. Davenport testified she was the triage nurse on duty when Graves initially visited UK PED. Since then, she was appointed Chair of the Evidence-Based Practice Counsel, which deals extensively with reviewing the electronic medical record system, including the audit log. To help the jury understand the audit log, Davenport first explained it. She further explained what each category in the audit log meant, *i.e.*, patient medical record number, date, time, and username.

Graves objected to Davenport's testimony. He relied on a pre-trial order which stated "treating physicians not named as experts will be limited in their testimony to factual findings as treating physicians. Testimony, and records custodians shall be limited to authentication of records." And, because Davenport was listed only as a fact witness in this case, Graves argued her testimony should be limited to her treatment of him. The circuit court overruled his objection, based on the doctors' representation they were only questioning Davenport on the entries made during triage.

Davenport testified regarding the times UK PED employees accessed Graves' medical record. Based on these entries, she testified Graves entered triage

at some point between 4:02 and 4:11 p.m. She further noted that she accessed Graves' record at 4:14 p.m. and entered into the system information she gathered during triage. Next, she testified that Patricia Ward accessed Graves' record at approximately 4:27 p.m. Because Ward's duties include transferring patients from triage to their hospital bay, she concluded it was highly likely Graves was in triage from sometime between 4:02 and 4:27 p.m. She also testified, during this time, Dr. Jones accessed Graves' record on multiple occasions and entered an order. She did not testify as to the course of Dr. Jones's treatment or what he ordered.

On appeal, Graves asserts the circuit court erred by allowing Davenport to testify regarding the audit log. "[W]e review a trial court's evidentiary determinations for abuse of discretion[.]" *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018).

The purpose of the pre-trial order upon which Graves relies was to prevent fact-witness physicians and other medical professionals from offering opinion testimony as though an expert witness. That is, they were prohibited from offering standard-of-care or causation opinion testimony. It did not limit the facts to which a fact witness could testify. KRE[5] 602 allows fact witnesses to testify about matters within their personal knowledge.

---

[5] Kentucky Rules of Evidence.

Here, Davenport testified that as Chair of the Evidence-Based Practice Counsel she regularly reviews UKMC's medical record system, including the audit log. Also, as a former UKMC nurse, using this software was part of her job duties. Therefore, she has personal knowledge about the audit trail and was able and authorized by the circuit court to convey her factual knowledge to the jury.

There is no suggestion that she expressed an opinion beyond her knowledge such as whether Dr. Jones conducted a thorough examination. Rather, she described a time frame, based on her entry and the entry of others, and testified to facts within and not beyond the scope of her knowledge. We find no abuse of discretion by the circuit court.

***The circuit court did not err by permitting James Daniel Moore, M.D. to testify.***

Several months before trial, on February 8, 2019, Graves returned to UK PED suffering from symptoms like those he experienced in July 2015. He was treated by Dr. James Daniel Moore. Dr. Moore's initial evaluation of Graves determined that he had a viral infection. He testified that he consulted with Dr. Jones, an attending physician that day, who recommended he review Graves' medical record. Upon review, Dr. Moore admitted Graves to the hospital. It turned out that Graves was again suffering from a bacterial infection like his initial infection. Graves filed a motion *in limine* to exclude medical records related to his February 2019 hospitalization as irrelevant. The circuit court denied the motion.

-15-

On April 22, 2019, the day prior to the doctors presenting their case-in-chief, they informed the court they intended to call Dr. Moore. Dr. Moore was not specifically listed on their witness list. However, their witness list did include a "catchall" provision that included "[a]ny and all medical providers not previously listed by" either party. Graves objected, and the doctors asserted Dr. Moore's testimony was rebuttal in nature. The circuit court ruled that his testimony was not rebuttal in nature but allowed Dr. Moore to testify about his medical care of Graves on February 8, 2019.

On appeal, Graves first argues the circuit court abused its discretion by allowing Dr. Moore to testify, substantially prejudicing his case. To support his position, Graves argues he had no opportunity to prepare or address Dr. Moore's testimony because Graves' February 8, 2019 medical episode occurred after discovery had closed. He also asserts nothing in Graves' medical records relating to the February appointment indicated Dr. Moore spoke to Dr. Jones about Graves' treatment. In addition, he contends this testimony "presented [Dr. Jones] as a hero who kept [Graves] from being improperly discharged" and the testimony "bolstered [the doctors] position that [Graves] previous infection was not susceptible to diagnosis on July 3, 2015."

The underlying "[d]iscovery matters such as this that 'come within the discretion of the trial court . . . do not amount to reversible error unless there is an

abuse of discretion and substantial prejudice.'" *Dornbusch v. Miller*, No. 2011-CA-001354-MR, 2013 WL 4710327, at \*6 (Ky. App. Aug. 30, 2013) (quoting *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1466 (6th Cir. 1993)). We are not persuaded that Graves was prejudiced by the ruling.

First, it was within the discretion of the circuit court to allow Dr. Moore to testify about his February treatment. We cannot doubt the testimony was relevant. Graves had knowledge of the hospitalization for over two months before trial and had the opportunity to review the hospitalization records. We cannot say he was prejudiced simply by the circuit court allowing the treating physician to testify about his care of Graves. This is especially so when Graves could have presented the February hospitalization records to his experts to form opinions as to Dr. Moore's treatment of Graves. Although the hospitalization records may not have put him on notice of the conversation between Dr. Moore and Dr. Jones, Dr. Jones testified as to this conversation during the trial. Therefore, any testimony by Dr. Moore that tended to depict Dr. Jones as a "hero" is merely cumulative.

Graves also asserts the doctors were operating in bad faith when they failed to disclose Dr. Moore as a witness. *See Peyton v. Commonwealth*, 253 S.W.3d 504, 512 (Ky. 2008). Specifically, he contends at a pre-trial hearing on March 7, 2019, the doctors argued for the exclusion of the February 2019 hospitalization records, which led him to believe Dr. Moore's treatment would not

-17-

be an issue. But, at two subsequent pre-trial hearings, one twelve days before trial, they changed course and argued that the records should be admitted. Graves argues their failure to disclose Dr. Moore after the records were ruled admissible constituted bad faith. We disagree.

A mere change in trial strategy alone does not constitute bad faith. Nor does the fact that they failed to disclose the witness until the day before he testified. The doctors contend they decided to call Dr. Moore simply to rebut testimony of Graves' mother. Although the circuit court found the nature of the testimony was not rebuttal, Dr. Moore was still allowed to testify. We fail to see evidence supporting a conclusion that the doctors purposefully failed to notify Graves to gain an unfair advantage. Again, we discern no abuse of discretion by the circuit court.

***The circuit court did not err by permitting Roger Humphries, M.D. to testify as to facts within his personal knowledge.***

Dr. Humphries was an attending physician on July 5, 2015, when Graves returned to UK PED. He is the Chair of Emergency Medicine at UKMC. In addition to his clinical duties, he is responsible for overseeing the operations of all emergency physicians, resident physicians, and advance practice providers. He was listed only as a fact witness for the doctors.

An issue at trial was whether Dr. McGaugh, a resident physician, had the authority to order such procedures as CT scans, x-rays, lumbar punctures, IV

-18-

antibiotics, IV fluids, etc. Dr. Humphries testified about the structure of the medical center, specifically how attending physicians supervise resident physicians and advance practice providers. He further testified that resident physicians do not have authority to order tests with significant consequences. Instead, it is the attending physicians who have such authority.

Graves objected. His basis, again, was the pre-trial order limiting treating physician's testimony to factual findings as a treating physician. The circuit court overruled the objection.

As noted above, the purpose of the pre-trial order was to eliminate the risk of fact-witness physicians from testifying as experts. That purpose was not run afoul here. Dr. Humphries, as a practicing clinician and Chair of Emergency Medicine at UK, oversees all attending and resident physicians. Therefore, he has personal knowledge regarding the structure and interactions of the doctors. He also has personal knowledge of resident physician authority to order tests. It was well within the circuit court's discretion to allow this testimony, regardless of the pre-trial order Graves relies upon. We find no abuse of discretion.

***The circuit court did not err by prohibiting Graves from cross-examining Dr. Humphries with deposition testimony of Dr. McGaugh.***

During the cross-examination of Dr. Humphries, Graves attempted to introduce the following deposition testimony of Dr. McGaugh to impeach his testimony regarding resident physicians' authority to order certain tests:

Q. And I understand you will say you could not [order an IV] because to put an order in would require a physician-

A. No, I can put an order in because I am a physician. But I can't put an order in to admit a patient because I'm not in the admission capacity as the physician there. I can order lab work, I can order medications, things like that, IV fluids.

Q. Could you have ordered an antibiotic for [Graves]?

A. Yes.

The doctors objected. The circuit court sustained the objection.

Graves asserts it was reversable error to prohibit him from introducing the deposition. He relies on CR 32.01(b), which states, "The deposition of a party . . . may be used by an adverse party for any purpose." Graves is correct that depositions may be used for any purpose; however, CR 32.01 does not stand for the proposition that it can be used against any witness. CR. 32.01 states:

> At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, *may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof*, in accordance with any of the following provisions:
>
> (a) Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of *deponent as a witness*.

-20-

> (b) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under Rule 30.02(6) or 31.01(2) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose.

CR. 32.01(a)-(b) (emphasis added).

Dr. Humphries is not a party to this action, nor is there any indication he was represented at the time of the deposition or put on notice. Generally, CR 32.01 authorized Graves to use the deposition, but it specifically did not authorize its use during the cross-examination of Dr. Humphries. If Dr. McGaugh's deposition was to be employed to impeach someone, it could and should have been used during examination of Dr. McGaugh himself. Allowing Graves to use the deposition in this manner would have prejudiced Dr. McGaugh as his counsel would have lacked the opportunity, unless leave was granted, to rehabilitate him.

Additionally, Graves alleges "[t]he deposition testimony of Dr. McGaugh, a party, was directly contradictory to the testimony of [Dr. Humphries]." This suggests its use as impeachment. However, impeachment requires presentation of inconsistent statements by the same witness. *See* KRE 801A. Graves cannot use the testimony of one witness to impeach that of another. The circuit court did not abuse its discretion.

***The circuit court appropriately dismissed UK and UKMC based on government immunity.***

Lastly, Graves appeals the dismissal of his complaint against the UK Defendants based on governmental immunity. A trial court's decision to grant governmental immunity is a pure question of law, which we review *de novo*. *Jacobi v. Holbert*, 553 S.W.3d 246, 252 (Ky. 2018).

"[G]overnmental immunity is the public policy, derived from the traditional doctrine of sovereign immunity, that limits imposition of tort liability on a government agency." *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001) (internal quotation marks and citations omitted). It is well established that "state universities of this Commonwealth, including the University of Kentucky, are state agencies that enjoy the benefits and protection of governmental immunity except where it has been explicitly waived by the legislature." *Furtula v. Univ. of Kentucky*, 438 S.W.3d 303, 305 (Ky. 2014); *see* KRS 49.070. There is no doubt UK is protected by governmental immunity. However, Graves primarily contends UKMC is not entitled to governmental immunity, and, it appears they are asserting, this defeats UK's immunity. We disagree.

The seminal case of *Withers v. University of Kentucky*, 939 S.W.2d 340 (Ky. 1997) guides our decision. In *Withers*, the plaintiff brought a wrongful death claim against UK, based on the alleged negligence of its physicians. Our Supreme Court addressed in part, "whether the University of Kentucky is entitled

to immunity from claims of medical negligence at its medical center[.]" *Id*. at 342. The court ruled it was. Although *Withers* didn't specifically state UKMC is entitled to immunity, this court has consistently held *Withers*' holding cloaks both UK and UKMC with immunity. *See Charash v. Johnson*, 43 S.W.3d 274, 276 (Ky. App. 2000) ("This issue has been settled by the Supreme Court, which held in *Withers* . . . that UKMC enjoys sovereign immunity."); *Garrison v. Leahy-Auer*, 220 S.W.3d 693, 699 (Ky. App. 2006) ("UKMC is entitled to governmental immunity in this case based on our Supreme Court's holdings in *Yanero* and *Withers*, as the functions of the UKMC in question were governmental.").

Relying on *dicta* from our Supreme Court, Graves urges us to revisit the holding in *Withers*. *Branham v. Rock*, 449 S.W.3d 741, 752 (Ky. 2014) (noting there may come a time for our courts to revisit *Withers*). Graves correctly points out that since *Withers* was decided, our Supreme Court has "recast" the analysis for governmental immunity. Traditionally, courts applied the two-prong test articulated in *Kentucky Center for the Arts Corporation v. Berns* to determine whether an entity is protected by governmental immunity. 801 S.W.2d 327 (Ky. 1990), *abrogated by Comair, Inc. v. Lexington-Fayette Urban Cty. Airport Corp.*, 295 S.W.3d 91 (Ky. 2009). Under that test, the court had to determine whether the entity claiming immunity (1) acts under the "direction and control of the central

state government"; and (2) is "supported by monies which are disbursed by authority of the Commissioner of Finance out of the State treasury." *Id*. at 331.

However, in *Comair*, our Supreme Court lessened the significance of the "*Berns*" test. It held, "[t]he more important aspect of *Berns* is the focus on whether the entity exercises a governmental function, which [*Berns*] explains means a 'function integral to state government.'" *Comair*, 295 S.W.3d at 99 (citation omitted).

Graves believes UKMC does not provide integral state functions, but rather proprietary functions, because it "sells a service in a competitive private marketplace, and hospitals exist without any affiliated public institution." We disagree. This very argument is not new. Others have claimed:

> the University of Kentucky Medical Center is nothing more than a hospital which is in full competition with and performs the same function as private hospitals. As such, they argue that in this respect, the University should be stripped of its immunity.
>
> The answer to this contention is simple. The operation of a hospital is essential to the teaching and research function of the medical school.

*Yanero*, 65 S.W.3d at 521 (quoting *Withers*, 838 S.W.2d at 343).

Our Supreme Court echoed this principle in a decision rendered after *Comair*, noting in *Withers*, it held "notwithstanding the fact that the University of Kentucky Medical Center competes with private hospitals, its essential role in the

teaching mission of the University of Kentucky College of Medicine rendered its activities governmental." *Breathitt Cty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009). If anything, "this 'refocused' approach only strengthens the decision in *Withers*[.]" *Pauly v. Chang*, 498 S.W.3d 394, 403 (Ky. App. 2015). We agree with the circuit court that UK and UKMC enjoy governmental immunity.

Relying on KRS 45A.245, Graves next asserts immunity was waived when Graves' parents signed a consent form. We disagree. KRS 45A.245(1) states, "Any person, firm or corporation, having a lawfully authorized written contract with the Commonwealth . . . may bring an action against the Commonwealth *on the contract*, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both." (Emphasis added.) KRS 45A.245 does not waive immunity in respect to tort claims.

Finally, Graves asserts he was prejudiced due to the early dismissal of UK because he was unable to conduct discovery on his direct liability claims against the University. It is well established "immunity entitles its possessor to be free 'from the burdens of defending the action, not merely . . . from liability.'" *Prater*, 292 S.W.3d at 886 (quoting *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006)). This includes "protection against the cost of trial and the burdens of broad-reaching discovery[.]" *Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142

S.W.3d 128, 135 (Ky. 2004) (internal quotation marks and citation omitted).

Therefore, the circuit court properly dismissed the claims against UK and UKMC.

## CONCLUSION

Based on the foregoing, we affirm the jury verdict judgment in favor of the doctors. We also affirm the Fayette Circuit Court's October 4, 2016 order dismissing UK and UKMC on grounds of governmental immunity.

ALL CONCUR.


BRIEF FOR APPELLANT:

William R. Garmer
Jerome P. Prather
Lexington, Kentucky

BRIEF FOR APPELLEES:

Edmund J. Benson
Stephen F. Soltis
Lexington, Kentucky